[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-13405

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 31, 2011
JOHN LEY
CLERK

D.C. Docket No. 05-10009-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GUSTAVO DOMINGUEZ,
a.k.a. Gus,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 31, 2011)

Before TJOFLAT, COX and BLACK, Circuit Judges.

COX, Circuit Judge:

Gustavo Dominguez, a professional sports agent, was convicted of smuggling five Cuban baseball players into the United States, transporting the players from Miami to Los Angeles, and harboring them there until they applied for asylum. *See*

8 U.S.C. § 1324(a)(2), (a)(1)(A)(ii), and (a)(1)(A)(iii) (criminalizing the bringing in, transporting, and harboring of unauthorized aliens). The theory of prosecution was that Dominguez, and several codefendants not parties to this appeal, conspired to bring, unsuccessfully attempted to bring, and then successfully brought five Cuban baseball players to the United States so that the players could pursue professional baseball careers. And, the prosecution's theory was that Dominguez had a role in transporting and harboring the players after their arrival in the United States. Dominguez anticipated that, after the players arrived, he would represent them as their agent, negotiate any potential baseball contract, and collect a percentage of their earnings as a fee. The indictment alleged, and the jury found, that Dominguez smuggled the players for the purpose of commercial advantage or private financial gain. Based on this finding, the district court imposed a five-year mandatory minimum sentence under 8 U.S.C. § 1324(a)(2)(B)(ii).

Dominguez now appeals, challenging his convictions and sentences on various grounds. He argues, among other things, that the evidence did not support any of his convictions.

We conclude that the evidence does not support Dominguez's convictions of transporting and harboring aliens (Counts 44 through 53). We reverse these convictions and vacate their sentences. We conclude the evidence supports

Dominguez's convictions of conspiracy to smuggle, aiding and abetting an attempted smuggle, and aiding and abetting a smuggle (Counts 1, 5, 6, 10, 13, 19, 28, 29, 33, 35, 40). We affirm these convictions and sentences. We find Dominguez's other assertions of error to be without merit.

## I.    BACKGROUND & PROCEDURAL HISTORY

### A.    Facts

Gustavo Dominguez is a native of Cuba and a naturalized United States citizen.[1] He works as a sports agent, and through his company, Total Sports International ("TSI"), he has represented over 100 baseball players, many of whom played for Major League baseball teams. Some of these baseball players were Cuban nationals who came to the United States without official documents authorizing their presence in the United States. This criminal case involves Dominguez's role in helping five Cuban nationals come to the United States in order to pursue professional baseball careers.

The smuggling venture at issue in this case began with Dominguez's relationship with Ysbel Medina-Santos ("Medina"). Medina has lived a life of crime; he has numerous prior convictions for drug trafficking, smuggling, insurance fraud,

---

[1]  Because we must determine whether the evidence is sufficient to support Dominguez's convictions, we state the evidence in the light most favorable to the Government. *United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007).

3

and money laundering. When he faced a lengthy prison sentence for drug smuggling, he agreed, in exchange for a potentially reduced sentence, to testify against Dominguez about his role in the smuggling of these Cuban baseball players.

According to Medina, he and Dominguez agreed in November 2003 to smuggle two Cuban players, Yuniesky Betancourt and Saydel Beltran, to the United States.[2] In exchange for Medina's assistance in smuggling the players into the United States, Dominguez promised that the players would pay Medina 5% of any Major League baseball contract that they might sign. Dominguez anticipated that he would represent the players as their agent, negotiate any potential baseball contract, and collect a percentage of their earnings as a fee. The smuggle was successful and, with the help of Dominguez's representation, Betancourt signed a Major League contract for $2.8 million with the Seattle Mariners. Medina then asked Dominguez for 5% of the contract ($140,000). After Betancourt failed to pay the $140,000, Medina held Dominguez responsible for the money.

In July 2004, about eight months after the Betancourt-Beltran smuggle, Dominguez contacted Medina about smuggling more Cuban players into the United

---

[2] The indictment does not charge Dominguez with any crimes regarding the Betancourt-Beltran smuggle. The district court admitted evidence of this prior smuggle under Federal Rule of Evidence 404(b), concluding that the evidence was relevant to establish Dominguez's intent to commit the smuggling offenses at issue in this case.

States. Dominguez and Medina agreed to bring five Cuban players to the United States: Francisely Bueno-Trueba, Osbek Castillo-Perez, Allen Guevara-Perez, Osmany Masso-Arredondo, and Yoankis Turino-Montalno. Medina told Dominguez, however, that he would not attempt to bring these players to the United States until he was paid at least $100,000 of the $140,000 that he was still owed for the Betancourt-Beltran smuggle. Dominguez then made two $50,000 transfers from an account he managed for another athlete client and wired the money to Medina, without the client's knowledge.

After Medina received the $100,000, he agreed to smuggle these five Cuban players. One of Medina's contacts called the players in Cuba, asked if they wanted to leave, and told them when and where they should meet the "fast boat." Medina hired Geoffrey Rodrigues to drive the fast boat from Cuba to the United States.[3]

This July 2004 smuggling attempt failed. The United States Coast Guard intercepted the fast boat about ten miles south of Key West, Florida. When Rodrigues attempted to flee, the Coast Guard shot the engine of the boat to get it to stop. The five players were detained and returned to Cuba.

After the first attempt failed, Dominguez asked Medina about a follow-up smuggle. Medina agreed to the follow-up. Because Rodrigues had been caught,

_____

[3] Rodrigues pled guilty to a single smuggling conspiracy charge in this case.

5

Medina hired Roberto Yosvany Hernandez to bring the players to the United States in exchange for $100,000.[4] The smuggle was successful. The five players, along with over a dozen other Cubans, were dropped off in the water off Deer Key, Florida on August 22, 2004, around 5:00 a.m. All five players testified that they had no papers authorizing their entry into the United States when they arrived.

In exchange for smuggling the five players into the United States, Medina wanted $150,000. Dominguez had no problem sending the money, but he warned Medina not to continue using his same bank account and instead to have the money directed into a friend's account. After the players arrived on August 22, 2004, and continuing into September 2004, Dominguez transferred $125,000 into the accounts of two of Medina's friends, his father, and his sister. These individuals then paid Medina. Dominguez still owed Medina $25,000.

After the players arrived in the Florida Keys, Medina brought them to the Miami home of Andy Morales, who is a former Major League player and former Dominguez client. The players were given clothes, food, and shelter. Medina informed Dominguez that the players had arrived, and Dominguez asked Medina to

---

[4] The jury acquitted Hernandez of all charges in this case. Despite Dominguez's suggestion to the contrary, this acquittal is irrelevant to the sufficiency of the evidence supporting Dominguez's convictions. *See United States v. Mitchell*, 146 F.3d 1338, 1344-45 (11th Cir. 1998) (stating that jury verdicts are "insulated from review" on the ground that they are inconsistent (citing *United States v. Powell*, 469 U.S. 57, 68-69, 105 S. Ct. 471, 478-79 (1984)) (alterations omitted)).

drive the players to Los Angles with Ramon Batista.[5] Medina, Batista, and the players left Miami on August 23 and arrived in Los Angeles on August 26.

When the players arrived in Los Angeles, Dominguez met them at a restaurant. He told them about his past successful representation of Cuban baseball players and that he could represent the players in similar fashion. All five players signed agency contracts with TSI. In addition to the contracts that the players signed with TSI, Dominguez had the players sign contracts obligating them to pay Medina a percentage of their baseball earnings. Dominguez and Medina intended for this arrangement to pay off the $25,000 balance that Dominguez owed Medina for the smuggle.

Shortly after the players arrived in Los Angeles, Dominguez arranged for Humberto Gray, an experienced immigration attorney who has done immigration work for TSI since the late 1990s, to process the players through immigration. By October, Gray had interviewed the players and was doing whatever was necessary to process them, including having them undergo examinations by physicians approved by United States Citizenship and Immigration Services (USCIS). Gray told Dominguez that he had set up an "initial appointment" for the players at the USCIS Los Angeles office sometime toward the end of October. Gray had the appointment

---

[5] Batista pled guilty to a transporting charge in this case.

changed to November because Dominguez had a conflict and would be unable to accompany the players to the USCIS office in October.

Meanwhile, TSI had the five players housed in an apartment complex. Every weekday, and on some Saturdays, they trained and played games at the Pierce College baseball facility in Woodland Hills. They were free to come and go as they pleased. They went out with friends, to restaurants, and to watch professional baseball games. The players were also featured in a documentary film that sought to portray the progression of Cuban baseball players in the United States. On November 12, TSI had the players tryout in front of scouts from almost all of the Major League clubs. The tryout was successful, as three of the five players signed Minor League contracts.

On November 19, Gray and Dominguez accompanied the five Cubans to the USCIS to apply for asylum and parole. They were paroled. Gray thereafter represented them before the USCIS. Turino and Guevara stayed in the United States. Bueno, Castillo, and Masso went to the Dominican Republic; Dominguez had arranged for them to play baseball in the Dominican Republic where they could be showcased before Major League scouts.

Dominguez testified at trial. "Dominguez's defense was based on testimony he was unaware the players were smuggled from Cuba and only found out they were

in Miami after their arrival." (Appellant's Brief at 55.) He denied having entered into an agreement with Medina to have them brought from Cuba to the United States.

### B. Procedural History

#### 1. The Indictment

In October 2006, a Southern District of Florida grand jury returned a fifty-three count indictment against Dominguez and others who are not parties to this appeal. The Government dismissed most of these counts prior to trial. Dominguez proceeded to trial on twenty-one counts: Count 1 charges Dominguez with conspiring to bring aliens to the United States, transport aliens within the United States, and conceal, harbor, and shield aliens within the United States, all for the purpose of commercial advantage or private financial gain, in violation of 8 U.S.C. § 1324(a)(2) and (a)(2)(B)(ii), 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(B)(i), 8 U.S.C. § 1324(a)(1)(A)(iii) and (a)(1)(B)(i), and 18 U.S.C. § 371. Counts 5, 6, 10, 13, and 19 charge Dominguez with aiding and abetting the attempt to bring in aliens to the United States for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(2), (a)(2)(B)(ii), and 18 U.S.C. § 2. Counts 28, 29, 33, 35, and 40 charge Dominguez with aiding and abetting the bringing of aliens to the United States for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(2), (a)(2)(B)(ii), and 18 U.S.C. § 2. Counts 44

through 48 charge Dominguez with transporting aliens within the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(B)(ii). And Counts 49 through 53 charge Dominguez with concealing, harboring, and shielding aliens from detection, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (a)(1)(B)(ii). Dominguez pled not guilty to all counts.

For the sake of clarity and brevity, our opinion groups Dominguez's convictions into three categories based on the nature of the charges. We refer to his convictions of conspiracy to smuggle (Count 1), the attempt to smuggle, (Counts 5, 6, 10, 13, 19), and smuggling (Counts 28, 29, 33, 35, 40) as the smuggling convictions. We refer to his convictions of transporting aliens (Counts 44 through 48) as the transporting convictions. And, we refer to his convictions of concealing, harboring, and shielding aliens from detection (Counts 49 through 53) as the harboring convictions.

### 2. Motion in Limine

Prior to trial, the Government filed a motion in limine seeking to preclude Dominguez from referring to "Legislative and Executive Branch immigration policies" that apply specifically to Cubans–namely, the Cuban Adjustment Act ("CAA"), 8 U.S.C. § 1255, and the "Wet-Foot / Dry-Foot" policy. In response, Dominguez's counsel argued that Dominguez reasonably believed the CAA and the

10

Wet-Foot / Dry-Foot policy gave the Cuban players eligibility to remain in the United States. *See* Appellant's Brief at 23 ("[Dominguez] understood [the players'] arrival to and presence in the U.S. was lawful."); *id.* at 35 ("The jury should have considered whether it was reasonable for the defendant to believe the Cubans were not illegally in the U.S. . . . ."); R.1-176-1 at 9 ("[A] Cuban national who arrives on dry land is eligible to remain in the United States, because that Cuban national's status in the United States is not in violation of the law."). He thus contended that the CAA and the Wet-Foot / Dry-Foot policy were relevant to the issue of intent to violate the law. The district court rejected this argument and granted the Government's motion in limine. The court found that Dominguez's beliefs about the CAA and the Wet-Foot / Dry-Foot policy were irrelevant to his intent to commit the charged offenses. The court therefore prohibited Dominguez from making any argument regarding the CAA and the Wet-Foot / Dry-Foot policy at trial.

### 3. Motion for Judgment of Acquittal

After the Government's case-in-chief, Dominguez moved the district court for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). He argued, among other things, that the Government had not established that he knew the five Cuban players had not received "prior official authorization"; that he transported the Cubans "in furtherance" of their illegal status; or that he concealed, harbored, and

11

shielded them to avoid detection. The court denied the motion. Dominguez renewed the motion at the close of all the evidence. That motion was denied as well.

### 4. Sentencing

After a seven-day trial, the jury convicted Dominguez on all twenty-one counts. The court sentenced Dominguez to a five-year mandatory minimum term for each of the twenty-one counts of conviction, with each term to be served concurrently. Dominguez received the five-year mandatory minimum under 8 U.S.C. § 1324(a)(2)(B)(ii) because he was convicted of smuggling three or more aliens for commercial advantage or private financial gain.[6]

## II.    ISSUES ON APPEAL

Dominguez raises the following issues on appeal: (1) whether the district court erred in denying his motion for judgment of acquittal because the evidence does not support any of his convictions; (2) whether the court erred in excluding evidence of the Wet-Foot / Dry-Foot policy and the Cuban Adjustment Act; (3) whether the court erred in precluding the testimony of an expert immigration witness; (4) whether the court erred in precluding evidence of the Major League baseball free agency rules;

---

[6] Section 1324(a)(2)(B)(ii) states that where a "[§ 1324(a)(2) smuggling] offense [is] done for the purpose of commercial advantage or private financial gain" the defendant shall "be fined under Title 18 and shall be imprisoned . . . in the case of a first or second violation of subparagraph . . . (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years."

(5) whether the court erred in admitting evidence of the Betancourt-Beltran smuggle under Federal Rule of Evidence 404(b); and (6) whether the court erred in denying his requested jury instructions.[7]

## III. DISCUSSION

### A. Sufficiency of the Evidence

Dominguez contends that the evidence at trial was insufficient to support his convictions for smuggling, transporting, and harboring aliens. We review challenges to the sufficiency of the evidence in criminal cases de novo, viewing the evidence in the light most favorable to the government. *United States v. Williams*, 527 F.3d 1235, 1244 (11th Cir. 2008) (citation omitted). "[E]vidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt

---

[7] Dominguez also raises other issues on appeal: (1) whether the court erred in granting the Government's motion for a continuance on the day of trial; (2) whether the court erred in denying Dominguez's request for specific voir dire questions; and (3) whether the cumulative effect of multiple errors denied the defendant a fair trial.

As to issue one, we conclude that the court did not abuse its substantial discretion in granting the Government's motion for a continuance following the hospitalization of the Government's sole trial lawyer in this case. The record does not support Dominguez's assertion that the motion was a deliberate act designed to gain an advantage, and Dominguez has not shown that he suffered significant prejudice as a result of the continuance. *See United States v. Key*, 76 F.3d 350, 354 (11th Cir. 1996).

As to issue two, we conclude that the court did not abuse its wide discretion in limiting voir dire of the prospective juror panel. The voir dire questioning as a whole complied with "the essential demands of fairness" and "gave reasonable assurance to the parties that any prejudice of the potential jurors would be discovered." *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990) (citation omitted) (internal quotation marks omitted).

As to issue three, to the extent any evidentiary or instructional errors occurred, the cumulative effect of any such errors did not deny Dominguez a fair trial.

beyond a reasonable doubt." *Id.* (citation omitted) (internal quotation marks omitted).

"We assume that the jury made all credibility choices in support of the verdict" and

"accept all reasonable inferences that tend to support the government's case." *Id.*

(citation omitted).

1.    Transporting (Counts 44-48)

Dominguez contends that the evidence is insufficient to support his conviction

for transporting aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).  That statute

punishes:

> Any person who . . . knowing or in reckless disregard of the fact that an
> alien has come to, entered, or remains in the United States in violation
> of law, transports, or moves or attempts to transport or move such alien
> within the United States by means of transportation or otherwise, in
> furtherance of such violation of law . . . .

*Id.*

Dominguez argues that the evidence failed to prove that he transported the Cuban players within the United States to further the players' unlawful presence.[8] We agree.

The evidence at trial showed that Dominguez sent Ramon Batista to pick up the five players in Miami and take them to Los Angeles. They arrived in Los Angeles on August 26, 2004. Shortly after the players arrived, they were taken to Humberto Gray, an experienced immigration attorney–who has done immigration work for TSI players since the late 1990s–to process the players through immigration. By October, Gray had interviewed the players and was doing whatever was necessary, including having them undergo examinations by physicians approved by USCIS, to process them. Gray told Dominguez that he had set up an "initial appointment" for the players at the USCIS Los Angeles office sometime toward the end of October. Gray had the appointment changed to November because Dominguez had a conflict and

_____

[8] Dominguez also argues that the evidence failed to prove that the Cuban players entered or remained in the United States "in violation of law." According to Dominguez, under the CAA and the Wet-Foot / Dry-Foot policy, the Cuban players were legally present as soon as they touched dry land. The Government's position, which the district court accepted, is that a Cuban who reaches United States soil remains "in violation of law" until they are inspected and admitted or paroled under 8 U.S.C. § 1255. In this case, the players arrived in Miami on August 23, 2004 and were not paroled until November 19, 2004. So, under the Government's theory, the players were present in violation of law from August 23, 2004 to November 19, 2004.

We need not address whether the Government's legal interpretation is correct because the transporting convictions must be reversed for reasons independent of whether the Cubans were present "in violation of law" from August 23, 2004 to November 19, 2004.

15

would be unable to accompany the players to the USCIS office in October. On November 19, 2004, Gray and Dominguez accompanied the five Cubans to the USCIS to apply for asylum and parole. They were paroled.

The evidence further showed that, from the time the players arrived on August 23, 2004 to the time they were paroled on November 19, 2004, the players lived freely and openly. They played baseball, went out with friends, ate at restaurants, and watched professional baseball games. On November 12, 2004, the players were "showcased" in front of scouts from almost every Major League team.

Based on this evidence, a reasonable jury could not find beyond a reasonable doubt that Dominguez transported the Cuban players from Miami to Los Angeles in order to further their illegal status. To the contrary, the players were taken to an experienced immigration attorney shortly after arriving in Los Angeles for the purpose of processing the players through immigration, and the players were paroled three months later. During that three month period, the players lived freely, openly, and in no way acted in a manner suggesting they were avoiding immigration officials. We therefore conclude that the evidence was insufficient to support Dominguez's conviction for transporting under § 1324(a)(1)(A)(ii) and the district court erred in denying Dominguez's motion for judgment of acquittal on these counts.

In arguing that the evidence is sufficient to prove that Dominguez acted to further the illegal status of the Cuban players, the Government relies on the fact that Dominguez waited about three months before taking the players to immigration officials. The Government does not, however, point to any statute or regulation with a specific time requirement for presenting Cubans to immigration officials. Considering that the immigration process started shortly after the players arrived, as well as the circumstances surrounding the purpose of the trip to Los Angeles, we cannot say that the three-month delay in reporting to immigration authorities supports the conclusion that Dominguez intended to transport the players in order to further their illegal immigration status.[9]

### 2. Harboring (Counts 49-53)

Dominguez contends that the evidence is insufficient to support his conviction of harboring aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). That statute punishes:

---

[9] As the Tenth Circuit has noted, the relevant evidence in establishing that a defendant acted in furtherance of an alien's illegal status will vary from case to case. *See United States v. Barajas-Chavez*, 162 F.3d 1285, 1289 (10th Cir. 1999) (en banc). The circumstances of this case are unique. Our reversal of Dominguez's convictions for transporting aliens should not be read as endorsing the idea that undocumented Cubans are free to wander indefinitely around the United States, or that they should not report to immigration officials as soon as possible. We simply hold that, under the facts of this case, the Government failed to prove that Dominguez transported the aliens to further their purported illegal status.

> Any person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation . . . .

*Id.*

Dominguez argues that the evidence did not establish that he "knowingly concealed, harbored, or shielded from detection" the five Cuban players from United States immigration officials.[10] We agree.

The jury was given the following instruction defining the phrase "conceal, harbor or shield from detection": "To 'conceal, harbor or shield from detection' includes any knowing conduct by the defendant tending to substantially facilitate an alien's escaping detection thereby remaining in the United States illegally." (R.14 at 1383; Dkt. 217 at 22.) The evidence does not support the conclusion that Dominguez substantially facilitated the Cuban players' escaping detection from immigration officials. As noted in discussing the transporting convictions, Dominguez took the players to experienced immigration counsel shortly after they arrived to process them through immigration, and the players in no way engaged in conduct suggesting that

---

[10] Dominguez also argues, as he does for the transporting convictions, that the evidence failed to prove that the Cuban players entered or remained in the United States "in violation of law." We need not address this argument because the harboring convictions, like the transporting convictions, are reversed on other grounds.

18

they were hiding from or otherwise avoiding immigration officials. We therefore conclude that the evidence was insufficient to support Dominguez's convictions under § 1324(a)(1)(A)(iii) and the district court erred in denying Dominguez's motion for judgment of acquittal on these counts.

3. Smuggling Convictions: Conspiracy to Smuggle, Aiding and Abetting the Attempt to Smuggle, and Aiding and Abetting an Actual Smuggle

a. Conspiracy to Smuggle (Count 1)

Dominguez contends that the evidence was insufficient to support his conviction of conspiring, in violation of 18 U.S.C. § 371,[11] to bring aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). That statute punishes:

> Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien . . . .

*Id.*

Thus, the elements of smuggling aliens in violation of 8 U.S.C. § 1324(a)(2) are (1) that the defendant knowingly brought an alien to the United States; and (2) that the

---

[11] 18 U.S.C. § 371 states:
> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

defendant knew or was in reckless disregard of the fact that the alien had not received prior official authorization to come to or enter the United States. To establish a criminal conspiracy under 18 U.S.C. § 371, "the Government must prove (1) that an agreement existed between two or more persons to commit a crime; (2) that the defendant knowingly and voluntarily joined or participated in the conspiracy; and (3) a conspirator performed an overt act in furtherance of the agreement." *United States v. Ndiaye*, 434 F.3d 1270, 1294 (11th Cir. 2006) (citation omitted). The court also instructed the jury that the Government had to prove Dominguez willfully joined the conspiracy knowing its unlawful purpose. The crime of conspiracy is complete upon the commission of an overt act. *See United States v. Arias*, 431 F.3d 1327, 1340 n.18 (11th Cir. 2005).

Dominguez argues that the evidence did not establish that he and Medina conspired to bring the five Cuban players to the United States without prior official authorization and that he knowingly participated in the conspiracy. Dominguez points out that, while Medina testified that Dominguez requested the five Cuban players, Medina did not testify that Dominguez knew they would arrive in the United States without prior official authorization.

The evidence was sufficient to prove that Dominguez willfully conspired to bring aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). The principle

is well-established that a conspiratorial agreement "may be proven by circumstantial evidence, including 'inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.'" *United States v. Silvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005) (citation omitted). Here, the totality of the circumstantial evidence supports the jury's conclusion that Dominguez willfully conspired with Medina to bring the five Cuban players to the United States and that Dominguez knew or recklessly disregarded the fact that the Cuban players did not have prior official authorization to come to the United States.

Medina testified that he had an extensive and ongoing smuggling relationship with Dominguez. The relationship started in 2003 when Medina and Dominguez agreed to smuggle Betancourt and Beltran to the United States so they could pursue professional baseball careers. This prior smuggle involved the same conduct as the charged smuggling offenses and occurred less than a year prior to the charged smuggling offenses. Further, Dominguez paid Medina $125,000 in order to fund the smuggling of the five Cuban players. Dominguez sent the payments to the accounts of Medina's friends and family who then paid Medina. And, to pay off the $25,000 balance that Dominguez owed Medina for the smuggle, Dominguez had the players sign contracts obligating them to pay a percentage of their baseball earnings to Medina. Finally, the players arrived in the United States in a speed boat and were

21

dropped off in the water off Deer Key, Florida, around 5 a.m. Based on the totality of the evidence, a reasonable jury could find that Dominguez knew or recklessly disregarded the fact that the five Cuban players did not have prior official authorization to come to the United States; that Dominguez willfully conspired with Medina–that is, acted with the specific intent to do something the law forbids; and that Medina knowingly brought the players to the United States in violation of § 1324(a)(2).

The conspiracy count in the indictment, Count 1, also charged a conspiracy to transport aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), and a conspiracy to harbor aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). "[W]here an indictment alleges a conspiracy to commit several offenses against the United States, the charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses." *United States v. Johnson*, 713 F.2d 633, 646 (11th Cir. 1983) (citation omitted). The jury's verdict form clearly indicates that they found that Dominguez conspired to commit each of the substantive offenses: smuggling, transporting, and harboring. (R.2-223.) Because the evidence is sufficient to support the conviction for conspiracy to commit alien smuggling, we affirm the conspiracy conviction on Count 1.

b. Aiding and Abetting the Attempt to Smuggle (Counts 5, 6, 10, 13, 19)

Dominguez contends that the evidence was insufficient to support his convictions of aiding and abetting, in violation 18 U.S.C. § 2,[12] the attempt to bring aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). These convictions were based on Dominguez's conduct with respect to the unsuccessful smuggle of the five Cuban players in July 2004, about a month prior to the successful smuggle.

Section 1324(a)(2), cited above, prohibits any person from knowingly bringing or attempting to bring to the United States an alien who does not have prior official authorization to enter the United States. *See* 8 U.S.C. § 1324(a)(2). "To convict for attempt, the government must prove: (1) the defendant was acting with the kind of culpability otherwise required for the commission of the crime for which he is charged with attempting; and (2) the defendant was engaged in conduct that constitutes a substantial step toward the commission of the crime. *United States v.*

---

[12] 18 U.S.C. § 2 states:
    (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
    (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

23

*Carothers*, 121 F.3d 659, 661 (11th Cir. 1997) (citing *United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir. 1974)).

To prove a substantive alien-smuggling offense under a theory of aiding and abetting, pursuant to 18 U.S.C. § 2, the evidence must establish that "(1) the substantive offense was committed by someone; (2) the defendant committed an act which contributed to and furthered the offense; and (3) the defendant intended to aid in its commission." *United States v. Camacho*, 233 F.3d 1308, 1317 (11th Cir. 2000) (citation omitted).

The evidence was sufficient to prove that Dominguez aided and abetted the attempt to bring aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). First, the attempted smuggling offense under § 1324(a)(2) was committed in July 2004 when Medina hired Geoffrey Rodrigues to bring the five Cuban baseball players to the United States, and Rodrigues was caught bringing the players to the United States. Second, Dominguez contributed to and furthered that offense by paying Medina $100,000; Medina testified that he would not attempt the July 2004 smuggle without the $100,000 payment for the previous Betancourt-Beltran smuggle. Third, the amount of this payment and the irregular manner of payment support the jury's conclusion that Dominguez intended to aid the commission of the July 2004 smuggle. *See United States v. Lopez*, 484 F.3d 1186, 1199 (9th Cir. 2007) (en banc) ("A

24

financier who organizes and funds a smuggling operation, . . . whether located in or outside of the United States, may be said to have 'associated himself with the venture, participated in it as in something he wished to bring about, and sought by his action to make it succeed.'" (alterations omitted) (citation omitted)). We therefore reject Dominguez's challenge to the sufficiency of the evidence for his conviction of aiding and abetting the attempted smuggling of the five players in July 2004.

c.      Alien Smuggling (Counts 28, 29, 33, 35, 40)

Dominguez contends that the evidence was insufficient to support his conviction of aiding and abetting the bringing of aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). These convictions were based on Dominguez's conduct with respect to the successful smuggle of the Cuban players in August 2004.

The evidence was sufficient to prove that Dominguez aided and abetted the bringing of aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). As noted in the context of the other convictions, Dominguez's role in the prior Betancourt-Beltran smuggle; the substantial amount of payment to Medina both before and after the players' arrival; the contracts that Dominguez had the players sign with Medina to pay off the smuggling debt; and the time, location, and manner in which the players arrived support the conclusion that Dominguez aided and abetted the smuggling of the five Cuban players in August 2004.

d.     Enhanced Sentence Under 8 U.S.C. § 1324(a)(2)(B)(ii)

Dominguez also challenges the sufficiency of the evidence with respect to the jury's finding that he participated in the smuggling operation, in violation of 8 U.S.C. § 1324(a)(2), for the purpose of commercial advantage or financial gain. The punishment under § 1324(a)(2) is enhanced if the smuggling offense is done "for the purpose of commercial advantage or private financial gain." 8 U.S.C. § 1324(a)(2)(B)(ii).[13] Dominguez argues that the evidence did not establish that he smuggled the Cuban players "for the purpose of commercial advantage or private financial gain" because he actually lost money after the players arrived in the United States. He stresses that none of the five players signed Major League contracts, and the three players who signed Minor League contracts did not sign for enough money to trigger a substantial fee. We reject this argument. The enhanced punishment under § 1324(a)(2)(B)(ii) does not turn on the financial success of the smuggling venture. As the Second and Ninth Circuits have pointed out, the statute "does not require evidence of an 'actual payment or even an agreement to pay' but merely requires that the defendant acted 'for the purpose of financial gain.'" *United States v. Kim*, 435

---

[13]  The challenge to the financial-gain enhancement relates only to the smuggling convictions. The counts of conviction for transporting aliens, under 8 U.S.C. § 1324(a)(1)(A)(ii), and harboring aliens, under 8 U.S.C. § 1324(a)(1)(A)(iii), did not allege that those offenses were committed for commercial advantage or financial gain. *See* 8 U.S.C. § 1324(a)(1)(B)(ii).

F.3d 182, 185 (2d Cir. 2006) (quoting *United States v. Angwin*, 271 F.3d 786, 805 (9th Cir. 2001)). The evidence at trial supported the jury's conclusion that Dominguez conspired to commit, and aided and abetted, the smuggling of the Cuban players to the United States so that he could sign them up as clients and collect a fee based on a percentage of their future earnings. Dominguez, moreover, paid a lot of money, around $125,000, to finance the players' smuggle, which supports the inference that Dominguez expected a return on his investment. We therefore reject Dominguez's challenge to the sufficiency of the evidence supporting the financial-gain enhancement under § 1324(a)(2)(B)(ii).[14]

  e.  Arguments Pertaining to the Cuban Adjustment Act and the Wet-Foot / Dry-Foot Policy

Dominguez contends that he reasonably believed the Cuban Adjustment Act ("CAA") and the Wet-Foot / Dry-Foot policy gave the players legal status in the United States. Thus, he argues, he lacked the intent required to support his convictions for smuggling under 8 U.S.C. § 1324(a)(2).[15] We reject this argument.

---

[14] Our reversal of Dominguez's convictions for transporting and harboring aliens does not affect the five-year mandatory minimum sentence under 8 U.S.C. § 1324(a)(2)(B)(ii). Dominguez's conspiracy conviction (Count 1), five attempted smuggling convictions (Counts 5, 6, 10, 13, 19) and five smuggling convictions (Counts 28, 29, 33, 35, 40) support the five-year statutory mandatory minimum sentence.

[15] Dominguez also argues that the CAA and the Wet-Foot / Dry-Foot policy show that he did not have the intent necessary to support his convictions for transporting and harboring aliens. As we explain above, independent of the CAA and the Wet-Foot / Dry-Foot policy, the evidence

United States immigration law and policy afford special treatment to Cuban nationals who come to the United States. Under the Cuban Adjustment Act, a native or citizen of Cuba, who has been inspected and admitted or paroled into the United States and has been physically present in the United States for at least two years, can apply for permanent residency in the United States.[16] By taking advantage of the CAA, Cuban nationals, who have no documents authorizing their presence in the United States, can remain in the United States without demonstrating that they suffered persecution or proving refugee status.[17] The benefits of the CAA, however, can only apply to those Cubans who reach United States soil (those with "dry feet") while Cubans who are interdicted at sea (those with "wet feet") are repatriated to

---

does not support these convictions and they must be reversed. We therefore need not address whether the CAA and the Wet-Foot / Dry-Foot policy had any bearing on the transporting and harboring convictions.

[16] *See* Cuban Adjustment Act, Pub. L. No. 89-732, § 1, 80 Stat. 1161 (1966) (codified as amended at 8 U.S.C. § 1255 (2006)). The Act states:

> [T]he status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least two years, may be adjusted by the Attorney General . . . to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence.

*Id.*

[17] For procedures governing asylum and proving refugee status, see generally 8 U.S.C. § 1158.

Cuba. This rule is commonly referred to as the "Wet-Foot / Dry-Foot" policy.[18]

Under the Department of Immigration and Naturalization Service's Meissner Memorandum, the Wet-Foot / Dry-Foot policy applies to Cubans regardless of whether they entered the United States at a designated port-of entry. Memorandum from Doris Meissner, Comm'r, Immigration & Naturalization Serv., Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a Designated Port-of-Entry (Apr. 19, 1999) [hereinafter Meissner Memorandum]. Dominguez claims that knowledge of this policy precludes a finding he possessed an intent to violate the law. This obliges us to decide what level of mental culpability 8 U.S.C. § 1324(a)(2) requires.

Section 1324(a)(2) requires proof of a defendant's mental state in two ways. First, the statute explicitly commands that a defendant know or recklessly disregard "the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States." 8 U.S.C. § 1324(a)(2). Furthermore, a smuggling offense occurs "regardless of any official action which may later be taken with respect to such alien." *Id.* Second, a defendant must knowingly bring or attempt to

---

[18] The policy has its foundation in a bilateral migration agreement signed in 1994 between the United States and Cuba, often called the "Joint Communique." *See* Cuba-United States: Joint Statement on Normalization of Migration, Building on the Agreement of September 9, 1994, 35 I.L.M. 327, 329 (stating that "migrants rescued at sea attempting to enter the United States will not be permitted to enter the United States, but instead will be taken to safe haven facilities outside the United States").

bring an alien to the United States.  *Id.*  Although the statutory language omits a *mens-rea* requirement as to this second element, a presumption exists in favor of a *mens-rea* requirement for each element of an offense.  *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72, 115 S. Ct. 464, 469 (1994).  Moreover, a court may treat the *mens rea* Congress provided in the statute as modifying each element that follows it.  *See id.* at 79, 115 S. Ct. at 472 (Stevens, J., concurring).  Thus, we decide a defendant must knowingly bring an alien to the United States.

However, a specific intent to violate the law is not required.  As an initial matter, "courts obviously must follow Congress' intent as to the required level of mental culpability for any particular offense."  *United States v. Bailey*, 444 U.S. 394, 406, 100 S. Ct. 624, 632 (1980); *see also Liparota v. United States*,  471 U.S. 419, 424, 105 S. Ct. 2084, 2087 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." (citation omitted)).  The Supreme Court has also said that "unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense."  *Bryan v. United States*, 524 U.S. 184, 193, 118 S. Ct. 1939, 1946 (1998); *see also Staples v. United States*, 511 U.S. 600, 622 n.3, 114 S. Ct. 1793, 1805 (1994) (Ginsburg, J., concurring) ("The mens rea presumption requires knowledge only of the facts that

30

make the defendant's conduct illegal . . . ." (citations omitted)); *United States v. Freed*, 401 U.S. 601, 612, 91 S. Ct. 1112, 1119 (1971) (Brennan, J., concurring) ("If the ancient maxim that 'ignorance of the law is no excuse' has any residual validity, it indicates that the ordinary intent requirement–mens rea–of the criminal law does not require knowledge that an act is illegal, wrong, or blameworthy."). When a statute proscribes conduct done "willfully," then the "jury must find that the defendant acted . . . with knowledge that his conduct was unlawful." *Bryan*, 524 U.S. at 193, 118 S. Ct. at 1946.

Requiring willful conduct in this instance is contrary to the plain language of the statute and its legislative history (discussed in more detail below), and would functionally eliminate the "reckless disregard" language Congress included in the statute. Congress was not silent as to mental culpability in § 1324(a)(2). The statute explicitly prohibits conduct done "knowing[ly]." Had Congress desired to punish only "willful" conduct, Congress could have drafted the statute to say as much. The statute's prohibition on bringing an alien in "reckless disregard" of the alien's unauthorized status furthers our conclusion that Congress has spoken clearly to the *mens-rea* element of the § 1324(a)(2) offense. "Reckless disregard," standing alone, may satisfy the *mens-rea* element of an offense. *See United States v. Mussaleen*, 35 F.3d 692, 698 (2d Cir. 1994). We decline to adopt a *mens rea* different than the one

31

chosen by Congress. We hold that willful conduct is not required to violate 8 U.S.C. § 1324(a)(2).

Our interpretation of 8 U.S.C. § 1324(a)(2) is strongly supported by its statutory history. That history, as pertinent to this case, begins with our decision in *United States v. Zayas-Morales*, 685 F.2d 1272 (11th Cir. 1982). *Zayas-Morales* involved the criminal prosecution of over 300 American vessel owners, captains, and crew members responsible for transporting over 125,000 undocumented Cubans from Mariel Harbor, Cuba to Key West, Florida (a designated port-of-entry) in 1980, in what has been called the "Freedom Flotilla." *Id.* at 1273-74. The defendants were indicted under 8 U.S.C. § 1324(a)(1) (1976), the predecessor to the version of the statute, 8 U.S.C. 1324(a)(2), involved in this case. *Id.* at 1273. The government charged the defendants with "bring[ing] into" the United States any alien "not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States."[19] *See id.* at 1274 & n.1 (quoting 8 U.S.C. § 1324(a)(1) (1976),

---

[19] The statute at issue in *Zayas-Morales*, 8 U.S.C. 1324(a)(1) (1976), stated in pertinent part:

> Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who–(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;
> . . . .
> any alien . . . not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this

32

amended by 8 U.S.C. § 1324(a)(1) & 1324(a)(2) (1986)).  For purposes of deciding the defendants' motion to dismiss the indictments, the government and the defendants stipulated that the defendants presented the Cuban aliens to immigration officials at Key West and that the defendants' intention in doing so was to allow the aliens to seek legal status in the United States.  *Id.* at 1274, 1277.  Based on these stipulated facts, we affirmed the dismissal of the indictments.  *Id.* at 1278.  We held that where the defendants were bringing in aliens with the intention of submitting those aliens to the proper officials so that the aliens might seek legal status in the United States, the defendants lacked the general intent necessary to violate 8 U.S.C. § 1324(a)(1) (1976).  *Id.*

Following our decision in *Zayas-Morales*, in 1986, Congress substantially rewrote 8 U.S.C. § 1324(a).  Pertinent to this case, Congress added § 1324(a)(2).  Unlike the statute we interpreted in *Zayas-Morales* which did not contain a mental state element, in the amended statute at § 1324(a)(2), Congress required that the defendant act knowingly.  *Compare* 8 U.S.C. § 1324(a)(1) (1976), *with* 8 U.S.C. § 1324(a)(2). Section 1324(a)(2) now punishes any person who knowingly brings to

chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs . . . .

33

the United States an alien while knowing or recklessly disregarding the fact that the alien has not received "prior official authorization to come to, enter, or reside in the United States." The statute explicitly states the offense occurs "regardless of any official action which may later be taken with respect to such alien." 8 U.S.C. § 1324(a)(2). The legislative history explains that Congress intended to "expand the scope of activities proscribed by federal law to reach the conduct of those participating in such operations as the Mariel boatlift." *United States v. Nguyen*, 73 F.3d 887, 892 (9th Cir. 1995) (citation omitted) (internal quotation marks omitted); *see also United States v. Garcia-Cordero*, 610 F.3d 613, 619 (11th Cir. 2010) (Korman, J., concurring) (noting that Congress enacted 8 U.S.C. § 1324(a)(2) to punish the type of conduct at issue in the Mariel "Freedom Flotilla" cases). Given that Congress's goal in amending § 1324 was to expand the number of activities prohibited by that section, and Congress redrafted the provision to dictate the mental state necessary to violate the statute, we are not bound by our decision in *Zayas-Morales*.

In *United States v. Barajas-Montiel*, 185 F.3d 947, 951-53 (9th Cir. 1999), the Ninth Circuit held that specific "criminal intent is required for conviction of the

felony offenses of 8 U.S.C. § 1324(a)(2)(B)."[20]  We do not find the *Barajas-Montiel*

opinion persuasive.   The *Barajas-Montiel* court correctly recognized that the

language of the statute does not require that the defendant specifically intend to

violate the law.  *Id.* at 951.  It then decided the § 1324(a)(2)(B) felony offenses must

contain a specific criminal intent element lest the statute run afoul of the *mens-rea*

presumption of the criminal law.  *Id.* at 952-53.  But, as we have said, conduct done

knowingly or with reckless disregard is sufficient to satisfy the *mens-rea*

presumption.  Under these circumstances, we decline to add a specific criminal intent

element when Congress has chosen not to do so.

Because willful behavior is not required, the special status afforded Cubans

under the CAA and the Wet-Foot / Dry-Foot policy is not relevant to the state of mind

required to commit smuggling in violation of 8 U.S.C. § 1324(a)(2).  The CAA and

the Wet-Foot / Dry-Foot policy do not provide "prior official authorization" for an

undocumented Cuban to come to the United States because an undocumented Cuban

must still be paroled, a process that "reclassif[ies] an alien from one who is illegally

remaining in the United States to one who is legally remaining in the United States

---

[20]  A number of circuits have interpreted 8 U.S.C. 1324(a)(1)(A)(ii) as requiring that the defendant knowingly transport an alien to further a violation of the immigration law, or act "willfully in furtherance of the alien's violation of the law."  *See, e.g.*, *United States v. Parmelee*, 42 F.3d 387, 390-91 & n.5 (7th Cir. 1994).  That interpretation of § 1324(a)(1)(A)(ii) does not demand that § 1324(a)(2) contain a willful element.

regardless of how entry into the United States was effected." *United States v. Medina-Garcia*, 918 F.2d 4, 8 (1st Cir. 1990). Thus, the CAA and the Wet-Foot / Dry-Foot policy instead pertain to "official action which may later be taken with respect to" the five Cuban players. *See* 8 U.S.C. § 1324(a)(2). By the plain language of the statute, the effect of the CAA and the Wet-Foot / Dry-Foot policy on the players' immigration status after they arrive in the United States is not relevant to a conviction for smuggling Cubans into the United States under § 1324(a)(2). And Dominguez's knowledge of these policies (if he had such knowledge) does not make the evidence supporting his smuggling convictions insufficient.

Two of these smuggling offenses–the conspiracy and attempt offenses–were complete prior to the time the Cuban players arrived in the United States. And, the smuggling offense was complete upon their arrival.

B.     Jury Instructions

Dominguez argues that the district court erred in failing to give his requested jury instructions. We review a district court's refusal to submit a defendant's requested jury instruction for an abuse of discretion. *United States v. Morris*, 20 F.3d 1111, 1114 (11th Cir. 1994) (citation omitted). In determining whether the district court abused its discretion by refusing to give a requested jury instruction, we consider three factors: "(1) whether the requested instruction is a substantially correct

36

statement of the law; (2) whether the jury charge given addressed the requested instruction; and (3) whether the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense." *United States v. Chirinos*, 112 F.3d 1089, 1101 (11th Cir. 1997) (citation omitted). In this case, we reverse Dominguez's counts of conviction for transporting aliens and harboring aliens, so we need not address whether the refusal to give a jury instruction pertaining to these counts was error. *See United States v. Siegelman*, 640 F.3d 1159, 1177 n.26 (11th Cir. 2011) (declining to address challenge to jury instruction pertaining to a count of conviction that has been reversed). We only address whether the refusal to give certain instructions affected the smuggling convictions.

Dominguez argues that the court erred in refusing to instruct the jury that a Cuban national arriving in the United States from Cuba is not required to arrive at a designated port of entry, but is permitted to arrive at any place and thereafter be processed by immigration authorities for inspection and adjustment. The instruction relates to the special treatment afforded Cubans under the CAA, Meissner Memorandum, and the Wet-Foot / Dry-Foot policy. As discussed above, this special treatment has no bearing on the knowledge a defendant must have to commit the smuggling offenses because those policies pertain to later official action taken with

respect to the alien. We therefore conclude that the denial of this instruction did not impair Dominguez's ability to defend against the smuggling charges.

Dominguez contends that the court erred in refusing to instruct the jury that he is entitled to rely in good faith on the advice of counsel concerning the players' immigration status. The timing and nature of Dominguez's conversations with counsel are not entirely clear from the record. To the extent Dominguez received advice from counsel only after the players arrived in the United States, the advice-of-counsel instruction has no relevance to Dominguez's smuggling convictions. Furthermore, no evidence suggested Dominguez fully disclosed the nature of the smuggling plan to an attorney, an important component of the good faith defense. The denial of this instruction did not impair Dominguez's ability to defend against the smuggling charges.

Dominguez argues that the court erred in refusing to instruct the jury that specific intent–that the Dominguez acted willfully–is an element of the smuggling charges. Similarly, he argues that the court erred in refusing to instruct the jury that a mistake of fact is a complete defense to the smuggling charges. The jury instructions regarding the § 1324(a)(2) smuggling offenses correctly addressed all elements of the offenses.

The district court instructed the jury, in accord with a plain reading of the statute, that in order to convict for alien smuggling the Government had to prove beyond a reasonable doubt:

*First*: That the defendant knowingly brought an alien to the United States;

*Second*: That the defendant knew or was in reckless disregard of the fact that the alien had not received prior official authorization to come to or enter the United States; and

*Third*: That the offense was done for the purpose of commercial advantage or private financial gain.

(R. 14 at 1380-81; Dkt. 217 at 19.)

The jury was instructed that "knowingly" means "that the act was done voluntarily and intentionally and not because of mistake or accident." (R. 14 at 1384-85; Dkt. 217 at 24.) As we have said, 8 U.S.C. § 1324(a)(2) does not contain a "willful" element. Because the instructions given by the district court were correct statements of the law, we find no abuse of discretion in the refusal to give a separate instruction on specific intent and mistake of fact.

Dominguez also contends that the court's instruction should only include "knowing" or "reckless disregard" but not both states of mind. This argument is meritless. Section 1324(a)(2) includes both knowledge and reckless disregard as alternative states of mind. *See* 8 U.S.C. § 1324(a)(2) ("Any person who, knowing *or* in reckless disregard of the fact that an alien has not received prior official

39

authorization to come to, enter, or reside in the United States . . . ." (emphasis added)). And, both states of mind were properly charged in the indictment and supported by the evidence. We find no abuse of discretion in giving the reckless disregard instruction.

The jury was also instructed that Dominguez had to willfully join the conspiracy. (R. 14 at 1376; Dkt. 217 at 13.) The court also correctly defined "willfully" as an act "committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose to either disobey or disregard the law." (R. 14 at 1385; Dkt. 217 at 24.) It is not clear from the Appellant's Brief that Dominguez objects to the conspiracy charge; if he does, we do not know the substance of the objection. The objection is therefore waived. *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

The instructions also adequately covered Dominguez's defense theory. Dominguez appears to recast his proposed instructions regarding good faith reliance on counsel, specific intent, mistake of fact, and the status of a Cuban national arriving at other than a designated port of entry as theory of defense instructions. As we have already stated, the district court did not abuse its discretion by refusing to give these instructions. The court's theory of defense instruction told the jurors it was Dominguez's theory of the case that he "never entered or intended to enter into any

40

conspiracy to bring aliens into the United States illegally, . . . nor did he knowingly engage in illegal alien smuggling or attempt to illegally smuggle aliens." (R. 14 at 1386; Dkt. 217 at 26.) This instruction adequately covered Dominguez's theory of defense–that he was unaware the players were smuggled from Cuba.

Dominguez argues that the court erred in refusing to revise its instruction on prior-bad-acts evidence admitted under Federal Rule of Evidence 404(b). This challenge is vague and without merit. The district court gave the pattern instruction on similar act evidence and did not abuse its discretion in refusing to revise this instruction.

### C. Evidentiary Issues

#### 1. Admission of Evidence of Betancourt-Beltran Smuggle Under Rule 404(b)

Dominguez argues that the district court abused its discretion in admitting testimony regarding his involvement with the smuggling of Betancourt and Beltran, two other baseball players. The district court permitted Medina to testify that, eight months before the smuggling of the players in this case, he and Dominguez conspired to smuggle Betancourt and Beltran to the United States. The district court admitted the testimony under Federal Rule of Evidence 404(b), concluding that the Betancourt-Beltran smuggle was relevant to Dominguez's intent to commit the

smuggling charges in the indictment. We review for abuse of discretion a district court's ruling on the admissibility of evidence of uncharged conduct under Rule 404(b). *United States v. Perez*, 443 F.3d 772, 774 (11th Cir. 2006) (citation omitted).

"Rule 404(b) permits the admission of prior-bad-acts evidence to show motive, preparation, knowledge, and intent, as well as an ongoing scheme or plan." *Id.* at 779 (citation omitted). We apply a three-part test to evaluate the admissibility of evidence under Rule 404(b): "(1) the evidence must be relevant to an issue other than the defendant's character; (2) there must be sufficient proof so that the factfinder could find that the defendant committed the extrinsic act; and (3) the evidence must possess probative value that is not substantially outweighed by undue prejudice." *Id.* (citation omitted); *see also United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc) (outlining same test).

Applying this test, we conclude that the district court did not abuse its discretion in admitting testimony of the Betancourt-Beltran smuggle. First, evidence of the Betancourt-Beltran smuggle was relevant to establish Dominguez's intent with respect to the conspiracy smuggling offense and the substantive alien-smuggling counts. By Dominguez's argument–that he did not know or recklessly disregard the fact that the Cuban players did not have prior authorization to enter the United States–Dominguez made intent an issue in the case, making the evidence of the

Betancourt-Beltran smuggle relevant for non-propensity purposes. *See Perez*, 443 F.3d at 779-80. Second, Medina's testimony provided a sufficient basis for the jury to find that Dominguez conspired with Medina to commit the Betancourt-Beltran smuggle. Third, the district court did not abuse its discretion when it determined the probative value of the Betancourt-Beltran smuggle, which involved the same conduct as the charged conspiracy and substantive smuggling offenses and occurred less than a year prior to the smuggle in this case, outweighed its prejudicial effect. *See id.* at 780. We therefore conclude that the district court did not abuse its discretion in admitting evidence of the Betancourt-Beltran smuggle as 404(b) evidence.

### 2. Exclusion of the CAA, Wet-Foot / Dry-Foot Policy, and Expert Immigration Testimony

Dominguez contends that the district court erred in excluding evidence pertaining to the CAA and the Wet-Foot / Dry-Foot policy, and in excluding the testimony of an immigration judge regarding the status of Cuban nationals under United States immigration law. He claims that this evidence was crucial in determining whether he had the required intent to smuggle, transport, and harbor the Cuban players. We review determinations of the admissibility of evidence for abuse of discretion. *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002) (citation omitted). We likewise review for abuse of discretion the district court's decisions

regarding the admissibility of expert testimony. *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc) (citation omitted).

In section III.A, we discuss the sufficiency of the evidence for the smuggling convictions and explain why the CAA and the Wet-Foot / Dry-Foot policy have no relevance to the sufficiency of the evidence to support these smuggling convictions. For the same reasons, they have no relevance to Dominguez's defense to the smuggling charges. In fact, Dominguez did not contend in the district court that the immigration judge's testimony about these policies would have assisted his defense to the smuggling charges. While arguing for the admission of testimony by the immigration judge, Dominguez's counsel proffered that the expert would testify that "[y]ou can't put a foreign national on a boat and bring them to the United States without permission. That's just not allowed, doesn't matter, Cuban national or anybody else, you can't do that." (R.11 at 897.) Because the immigration judge's testimony on the smuggling counts would have been detrimental to Dominguez, the immigration judge's testimony could not have changed the jury's verdict on the smuggling counts. This excerpt regarding the immigration judge's testimony highlights that the CAA and the Wet-Foot / Dry-Foot policy are not relevant to the smuggling convictions we are affirming in this case. As we have said, two of these smuggling offenses–the conspiracy and attempt offenses–were complete prior to the

time the Cuban players arrived in the United States. At least as to these two offenses, it is hard to imagine the relevance of policies that address Cubans' immigration status *after* their arrival in this country. The exclusion of evidence about them did not, as to the smuggling convictions, affect Dominguez's substantial rights. *See* Fed. R. Crim. P. 52(a).

To the extent evidence of the CAA and the Wet-Foot / Dry-Foot policy relate to Dominguez's convictions of transporting and harboring aliens, we need not address these purported errors because we reverse those convictions for insufficiency of the evidence. *See United States v. Law*, 528 F.3d 888, 898-99 (D.C. Cir. 2008) (declining to address evidentiary errors relating to counts of conviction reversed on other grounds).

### 3. Exclusion of Major League Baseball Free Agency Rules

Dominguez contends that the district court erred in excluding evidence pertaining to the Major League Baseball free agency rules. He argues the evidence was necessary to respond to the Government's theory that he delayed the players' immigration processing in order to manipulate the free agency system.

To the extent the exclusion of the Major League baseball rules relates to Dominguez's convictions for transporting and harboring the players, we need not

address these purported errors because we reverse those convictions for insufficiency of the evidence. *Id.*

To the extent the free agency rules are relevant to the smuggling convictions, we conclude that any error in excluding this evidence, if there was error, was harmless. *See Frazier*, 387 F.3d at 1266 n.20 (requiring reversal in a criminal case only if erroneous evidentiary decision "[had] a 'substantial influence' on the outcome of a case or [left] 'grave doubt' as to whether they affected the outcome of a case" (citation omitted)). Dominguez argues that the free agency rules were necessary to rebut the Government's theory regarding the three-month delay in the players' immigration processing. That delay has no relevance to whether Dominguez conspired to smuggle and assisted in smuggling the Cuban players to the United States. Thus we are not left with a grave doubt that the exclusion of the free agency rules affected the smuggling convictions.

## IV. CONCLUSION

Count 1 charges Dominguez with conspiring to bring aliens to the United States for the purpose of commercial gain or financial advantage, in violation of 8 U.S.C. § 1324(a)(2), (a)(2)(B)(ii), and 18 U.S.C. § 371. We affirm Dominguez's conviction and sentence on this count.

Counts 5, 6, 10, 13, and 19 charge Dominguez with aiding and abetting the attempt to bring in aliens to the United States for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(2), (a)(2)(B)(ii), and 18 U.S.C. § 2. We affirm Dominguez's convictions and sentences on these counts.

Counts 28, 29, 33, 35, and 40 charge Dominguez with aiding and abetting the bringing of aliens to the United States for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(2), (a)(2)(B)(ii), and 18 U.S.C. § 2. We affirm Dominguez's convictions and sentences on these counts.

We reverse Dominguez's convictions on all other counts and vacate his sentences on these other counts.

AFFIRMED IN PART, REVERSED IN PART, AND VACATED IN PART.

TJOFLAT, Circuit Judge, concurring in part, dissenting in part:

I concur in the court's judgment reversing Dominguez's convictions for the 8 U.S.C. § 1324(a)(1)(A)(ii)[1] transporting violations, Counts 44 through 48, and the 8 U.S.C. § 1324(a)(1)(A)(iii)[2] harboring violations, Counts 49 through 53. I dissent, however, from court's affirmance of Dominguez's convictions for conspiring, in violation of 18 U.S.C. § 371,[3] to commit those offenses and the smuggling offense,

_____

[1] 8 U.S.C. § 1324(a)(1)(A)(ii) (2006) states, in relevant part:

(1)(A) Any person who—
. . . .
(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports . . . such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;
. . . .
shall be punished as provided in subparagraph (B).

[2] 8 U.S.C. § 1324(a)(1)(A)(iii) (2006) states, in relevant part:

(1)(A) Any person who—
. . . .
(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, . . . harbors[] or shields from detection . . . such alien in any place . . . ;
. . . .
shall be punished as provided in subparagraph (B).

[3] 18 U.S.C. § 371 states:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

48

8 U.S.C. § 1324(a)(2)(B)(ii), Count 1; for attempted smuggling, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), Counts 5, 6, 10, 13, and 19; and for smuggling, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), Counts 28, 29, 33, 35, and 40.[4]

My disagreement with the court primarily rests on four grounds. First, because I conclude that proof of general criminal intent is a required element of the § 1324(a)(2)(B)(ii) offenses, I would reverse Dominguez's convictions for those offenses and the conspiracy offense, and remand for a new trial. The district court committed reversible error in excluding evidence of the federal immigration policy governing the status Cuban refugees and in preventing Dominguez from contending that he did not intend to do something the law forbids—to act with criminal intent—when he arranged to bring the players to the United States so they could be granted asylum. The court then compounded the error when it failed to instruct the

---

[4] Both attempted smuggling and smuggling are violations of 8 U.S.C. § 1324(a)(2), which states:

> Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs [be subjected to a fine or imprisonment, or both].

Section 1324(a)(2)(B)(ii) states that "[if] an offense [is] done for the purpose of commercial advantage or private financial gain," the defendant shall "be fined under Title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years."

jury that it could not find Dominguez guilty of the § 1324(a)(2)(B)(ii) offense unless it found that he acted "willfully."[5]  Second, even if criminal intent is not required for a § 1324(a)(2)(B)(ii) conviction, it was required for the Count 1 § 371 conviction, because the indictment, the Government's requested jury instructions, and the instructions the court gave all required the jury to find that Dominguez acted "willfully," thereby placing Dominguez's intent—his mens rea defense—at issue. Third, if the first two grounds are without merit, the evidence Dominguez wanted to introduce was necessary to consider whether he knew or acted in reckless disregard of the aliens' status; hence, its exclusion constituted reversible error.  Fourth, and by no means the least important, is that the today's criminal intent holding creates a circuit split.

In essence, the district court denied Dominguez a fair trial by depriving him of the opportunity to present his mens rea defense to Counts 1, 5, 6, 10, 13, 19, 28, 29, 33, 35, and 40[6]—that he brought the Cuban baseball players to the United States for a lawful purpose, so they could be granted asylum and paroled in accordance with the

---

[5] Eleventh Circuit Pattern Jury Instructions (Criminal) at 35, Basic Offense Instruction 9.1A (defining "willfully" to mean an act with a general, not specific, criminal intent, or in other words, requiring a finding that the defendant acted "purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law.").

[6] The district court also denied Dominguez the opportunity to present the same mens rea defense to the charges contained in Counts 44 through 53.  The error is of no moment, however, because we are reversing the convictions for those counts on other grounds.

federal immigration policy governing the status of Cuban refugees, as expressed in the Cuban Adjustment Act, 8 U.S.C. § 1255,[7] the Meissner Memorandum,[8] and the Wet-Foot/Dry-Foot policy.[9]

To demonstrate these errors, I explain, in part I, the United States immigration policy governing the treatment of Cuban refugees and how the Government implemented that policy in this case. Part II sets out the court's holding that all of this is irrelevant. Part III explains why that holding is erroneous—that general

---

[7] 8 U.S.C. § 1255(a) states:

[t]he status of an alien who was inspected and admitted or paroled into the United States or the status of any other alien having an approved petition for classification as a VAWA self-petitioner may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

[8] See Memorandum from Doris Meissner, Comm'r, INS, to all Regional Directors, all District Directors, all Chief Patrol Agents, and all Officers-in-Charge, file No. HQCOU 120/17-1, Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other Than a Designated Port-of-Entry (April 19, 1999), available at http://www.uscis.gov/files/pressrelease/CubanParole_4Mar08.pdf ("Attachment–A") [hereinafter the "Meissner Memorandum"]. The Meissner Memorandum instructs the officials of the United States Citizenship and Immigration Services, a component of the Department of Homeland Security, which succeeded the Immigration and Naturalization Service regarding Cuban refugee applications for permanent residency. See 6 U.S.C. § 271 (describing new authority of the United States Citizenship and Immigration Services).

[9] "The so-called 'Wet-foot/Dry-Foot' policy . . . applies to Cuban refugees who reach United States land. If they reach land, they are allowed to stay, apply for political asylum and eventually residency." Movimiento Democracia Inc. v. Chertoff, 417 F. Supp. 2d 1343, 1344 (S.D. Fla. 2006). For a full explication of the Wet-Foot/Dry-Foot policy see part I, infra.

criminal intent is the appropriate level of mens rea of the counts alleging a violation of § 1324(a)(2)(B)(ii). Part IV explains that, regardless of whether criminal intent is an element of the substantive offenses, Dominguez's intent was relevant to his conspiracy charge given that the indictment, the Government's requested jury instructions, and the district court's instructions all required the jury to find that Dominguez acted "willfully." Part V sets out additional reasons why, even assuming there is no criminal intent, the district court still erred. Part VI concludes.

I.

This part traces the origins of the Wet-Foot/Dry-Foot policy in light of established United States' immigration policy toward Cubans.

A.

1.

The Immigration and Nationality Act (the "INA"), Pub. L. No. 82-414, 66 Stat. 163 (1952) (enacted as amended in scattered sections of 8 U.S.C.), declares, as a general rule, that an alien who arrives in the United States "at any time or place other than as designated by the Attorney General,"[10] or who lacks a "valid entry document,"

---

[10]   A place designated by the Attorney General is often referred to as a "Port-of-Entry." 8 C.F.R. § 100.4; see also 3 C.J.S. Aliens § 546 (defining an "arriving alien").

is inadmissible and immediately removable.[11]  In either case, a removable alien may

apply for asylum as a refugee, 8 U.S.C. § 1158,[12] withholding of removal,[13] protection

---

[11]  See 8 U.S.C. § 1182(a)(6)(A)(i) (2006) (regarding admission and parole); see also 8 U.S.C. § 1182(a)(7)(A)(i)(I) (regarding entry documents).

[12]  8 U.S.C. § 1158(a)(1) (2006) states, in pertinent part, "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum . . . ."
8 U.S.C. § 1158(b)(1)(A) states,

> The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

[13]  On applying for asylum, the alien may also apply for withholding of removal under 8 U.S.C. § 1231 (2006), which states in subsection (b)(3)(A), that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."

under the United Nations Convention Against Torture,[14] and admission into the

United States.  A refugee is:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).  If the alien "does not have a credible fear of persecution,

the officer shall order the alien removed from the United States without further

hearing or review," 8 U.S.C. § 1225(b)(1)(B)(iii)(I), subject to the alien's right under

8 U.S.C. § 1225(b)(1)(B)(iii)(III) to "request . . . prompt review by an immigration

judge."  If the asylum officer or immigration judge grants the alien's application for

asylum, the alien may be paroled pending final determination of his immigration

---

[14]  In addition to applying for withholding of removal, the alien may seek relief under the Convention Against Torture, executed by the Foreign Affairs Reform and Restructuring Act, which states in pertinent part that,

> [i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.

Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, div. G, § 2242(a), 112 Stat. 2681-761, 2681-822 (codified at 8 U.S.C. § 1231 note).

status for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

Cuban aliens, however, occupy a unique position. A Cuban who arrives in the United States is presumed to be a refugee, and therefore entitled to asylum.[15] This presumption is based on the political and economic repression Cuban citizens have been suffering at the hands of the Castro government since it came to power in 1959. In the early years after Castro took over, the United States government welcomed Cuban refugees with open arms. Indeed, between 1965 and 1971, the United States government itself airlifted approximately two hundred-sixty thousand refugees out of Cuba and into the United States under the so-called "Freedom Flights" program.[16]

Political favor for Cuban refugees achieved official status in 1966, with the passage of the Cuban Adjustment Act (the "CAA"). That act granted special status to Cubans coming to the United States. It provided, in pertinent part,

> the status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least two years, may be adjusted by the Attorney

---

[15] A Cuban, like other applicants for asylum, may be denied asylum under certain extraordinary circumstances, including where "there are serious reasons for believing that the [Cuban] has committed a serious nonpolitical crime outside the United States prior to the arrival of the [Cuban] in the United States." 8 U.S.C. § 1158(b)(2)(A)(iii).

[16] Cuba: Migration, U.S. Department of State, http://www.state.gov/www/regions/wha/cuba/migration.html (last visited September 12, 2011).

General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence.

Pub. L. No. 89-732, § 1, 80 Stat. 1161, 1161 (1966).[17]

As explained by the House Judiciary Committee, in order to grant Cubans this special status, Congress had to except them from the prohibition then present within § 245(c) of the INA, which provided that "natives of any country of the Western Hemisphere, or of any adjacent island named in section 101(b)(5) of the Immigration and Nationality Act" were ordinarily "precluded from applying for adjustment to permanent resident status while in the United States." H.R. Rep. No. 89-1978, at 1 (1966), reprinted in 1966 U.S.C.C.A.N. 3792, 3793. Congress separated Cubans from other natives of the Western Hemisphere because, as the House Judiciary Committee explained,

[t]he only recourse available to a refugee from Cuba under existing law in order to change to immigrant status is the awkward procedure of leaving the United States for an indefinite period of time in order to secure an immigrant visa at a U.S. consular office abroad and then reentering as a permanent resident.

_____

[17] The Attorney General subsequently prescribed a regulation authorizing an alien meeting the eligibility requirements of the CAA to apply for adjustment of status to that of a lawful permanent resident to the [INS, now United States Citizenship and Immigration Services] director having jurisdiction over the alien's place of residence. See 8 C.F.R. § 245.2. This provision was amended in 2006, after the events involved in this case.

H.R. Rep. No. 89-1978, at 2, 1966 U.S.C.C.A.N at 3794.

In addition to avoiding this awkward procedure, the CAA would "aid in [Cuban refugees'] resettlement by enhancing their opportunity to qualify for employment in all areas of the Nation." Id. Moreover, it would afford Cubans the same sort of opportunities that other immigrants might have: "The fact should not be overlooked that the beneficiaries of this legislation could have come to the United States as immigrants had diplomatic relations been maintained between the United States and Cuba." Id.

Despite the existence of the CAA, the days of clear political preference for Cuban refugees would come to an end. The massive 1980 "boatlift" from the port of Mariel, Cuba, marked a new crisis point in the United States's expressed policy of "open heart, open arms" towards Cuban refugees.[18] In the aftermath of a riot at the Peruvian Embassy in Havana, Castro announced that the port of Mariel was "open" to all who wanted to leave Cuba. Soon, American vessels were picking up refugees from Mariel and transporting them to United States shores. According to United

---

[18] Time magazine quoted President Jimmy Carter as stating that:

Ours is a country of refugees. We'll continue to provide an open heart and open arms to refugees seeking freedom from Communist domination and from the economic deprivation brought about by Fidel Castro and his government.

Nation: Open Heart, Open Arms, Time, May 19, 1980, at 14.

States Coast Guard statistics, nearly one hundred twenty-five thousand Cubans fled

to the United States in what became known as the "Freedom Flotilla."[19]

2.

This set the stage for this court's decision in United States v. Zayas-Morales,

685 F.2d 1272 (11th Cir. 1982). Zayas-Morales involved the prosecution of the

owners and captains of American vessels, and those assisting them, who, as part of

the Freedom Flotilla, picked up thousands of refugees from Mariel Harbor and

brought them to Key West, Florida over the strong objection of the United States

government. Id. at 1274. The Zayas-Morales court described the Government's

objection:

> The first group of aliens arrived in the United States on April 21, 1980. Two days later, the United States Coast Guard initiated warnings by means of radio broadcasts alerting all listeners to the possibility of arrests and seizure of vessels for transporting undocumented aliens to the United States. By that time many of the vessels had left the United States for Mariel Harbor. At approximately the same time, the United States Customs Service began issuing written notices requiring customs clearance prior to departure from United States ports and warning that transportation of undocumented aliens was illegal. Dissatisfied with the results of the initial efforts to halt the mass influx of aliens, on May 14, 1980, the President imposed an embargo on boats attempting to leave

---

[19] Mariel Boatlift, U.S. Coast Guard Alien Migrant Interdiction, Coast Guard Off. of L. Enforcement, http://www.uscg.mil/hq/cg5/cg531/AMIO/mariel.asp (last visited September 12, 2011) (describing U.S. Coast Guard activity during the so-called Mariel Boatlift, a.k.a. the Freedom Flotilla).

our territorial waters and ordered a return of United States vessels from Mariel Harbor. So ended the Freedom Flotilla.

685 F.2d at 1274 (citation omitted).

To indicate how condemnable it considered the defendants' conduct, the Government indicted 336 of those involved in the Freedom Flotilla under 8 U.S.C. § 1324(a)(1), the predecessor to the version of the statute, 8 U.S.C. § 1324(a)(2), involved in this case. Id. at 1274. Section 1324(a)(1) stated, in pertinent part:

> Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—
> (1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or though another, to bring into or land in the United States, by any means of transportation or otherwise;
> . . . .
> any alien . . . not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs.

Id. at 1274 n.1 (quoting 8 U.S.C. § 1324(a)(1) (1976)).

The district court dismissed the indictment on the ground that the defendants did not commit a "crime in presenting the Cubans at the border checkpoint."[20] We

---

[20] The district court explained it in these words:

8 U.S.C. § 1324(a)(1) requires that an entry be made either by fraudulent or

affirmed the dismissal on the ground that the Government failed to prove that the defendants acted with criminal intent, the mens rea element that the district court, at the Government's urging, ruled irrelevant in Dominguez's case.[21]  Id. at 1273–74. The defendants lacked the requisite mens rea because they clearly intended to submit the aliens to proper immigration officials in full compliance with the law:

> [N]ot only had the defendants presented the aliens to the proper officials, but . . . their intention in doing so was to allow the aliens to seek legal status in this country. . . .  Such an intention neutralizes any government theory that the defendants possessed the criminal intent necessary for a conviction under 8 U.S.C. § 1324(a)(1).

Id. at 1277.

The defendants' lawful intent to retrieve Cubans without visas and deliver them to U.S. immigration officials was effective the moment the boats left Mariel Harbor and remained effective until delivery into the United States.  See id. at 1274 (discussing stipulations made by the parties).  Therefore, what the defendants intended to do with the aliens after their arrival in the United States was relevant to their intent to disobey the law.  Id. at 1276–77.

---

surreptitious means.  By admission and stipulation of the parties, no entry of aliens was effectuated by the defendants' actions in these boatlift cases.  As stated above, the defendants committed no crime in presenting the aliens at the border checkpoint.

United States v. Anaya, 509 F. Supp. 289, 299 (S.D. Fla. 1980).

[21]  We affirmed on a rationale not relied upon by the district court.

3.

In light of several concerns arising, in part, out of our decision in Zayas-Morales, Congress revised § 1324 in 1986. I focus on those changes directly relevant to my disagreement with the court's holding today—that evidence of the federal immigration policy governing the status of Cuban refugees and Dominguez's reliance on that policy is irrelevant.

First, Congress split the "bring into" provision of § 1324(a)(1) into two separate provisions. The first provision, § 1324(a)(1)(A)(i), makes it unlawful to bring an alien into the United States "at a place other than a designated port of entry."[22] A person violating this provision may be sentenced to prison for not more than ten years for each alien brought to the United States at such place.[23] The second provision, § 1324(a)(2), makes it unlawful to bring any alien to the United States who

---

[22] 8 U.S.C. § 1324(a)(1)(A)(i) (2006) applies to anyone who,

knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien.

[23] 8 U.S.C. § 1324(a)(1)(B)(i) (2006) declares, in pertinent part: "A person who violates [§ 1324(a)(1)(A)(i)] shall, for each alien in respect to whom such a violation occurs . . . be fined under Title 18, imprisoned not more than 10 years, or both."

has not received prior official authorization.[24]  A comparison of the text of the old version of § 1324(a) with the text of the new version reveals that Congress added language to clarify that the new § 1324(a)(2) applies only to those individuals who act "knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come into, enter or reside, in the United States" and that a violation of § 1324(a)(2) can occur "regardless of any official action which may later be taken with respect to such alien."

In drafting § 1324(a)(2), Congress created both a misdemeanor and a felony. The misdemeanor is punishable by a fine or imprisonment for not more than one year, or both;[25] and the felony, depending on the intent or purpose for which it was committed, is punishable by a fine and imprisonment for a maximum term of ten or fifteen years.[26]  The presentence report prepared by the district court's Probation

---

[24]  8 U.S.C. § 1324(a)(2) (2006) states,

[a]ny person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs [shall be subjected to a fine or imprisonment, or both].

[25]  8 U.S.C. § 1324(a)(2)(A) (2006) provides that a person violating § 1324(a)(2) "be fined in accordance with Title 18 or imprisoned not more than one year, or both" for each violation.

[26]  8 U.S.C. § 1324(a)(2)(B) (2006) provides that if the offense is:

Office for Dominguez's case recommended imprisonment for a minimum term of three years and a maximum term of ten years for Counts 5, 6, 28, and 29 and a minimum term of five years and a maximum term of fifteen years for Counts 10, 13, 19, 33, 35, and 40.[27]

4.

Eight years after Congress revised 8 U.S.C. § 1324(a), the Wet-Foot/Dry-Foot policy emerged. The Clinton Administration sought to quell a new Cuban immigration crisis by entering into the Joint Communique of 1994 and the Joint Statement of 1995 (collectively, the "Migrant Accords") with the Cuban government.[28] Signed on September 9, 1994, the Joint Communique provided that

---

(i) . . . committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year, (ii) . . . done for the purpose of commercial advantage or private financial gain, or (iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,

[the violator shall] be fined under Title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

[27]  The § 1324(a)(2) offenses of which Dominguez was convicted were "done for the purpose of commercial advantage or private financial gain." See 8 U.S.C. § 1324(a)(2)(B)(ii).

[28] The number of Cuban "boat people" setting out for United States shores "steadily rose from a few hundred in 1989 to a few thousand in 1993." Ruth Ellen Wasem, Cong. Research Serv., R40566, Cuban Migration to the United States: Policy and Trends 1 (2009), available at http://www.fas.org/sgp/crs/row/R40566.pdf. Following a series of "threatening speeches"

migrants rescued at sea attempting to enter the United States will not be permitted to enter the United States, but instead will be taken to safe haven facilities outside the United States. Further, the United States has discontinued its practice of granting parole to all Cuban migrants who reach U.S. territory in irregular ways.

Cuba-United States: Joint Statement on Normalization of Migration, Building on the Agreement of September 9, 1994, 35 I.L.M. 327, 329.

In return, Cuba agreed to "prevent unsafe departures using mainly persuasive methods." Id. The United States further committed "through other provisions of United States law, to authorize and facilitate additional lawful migration to the United States," establishing that a "minimum of 20,000 Cubans each year" would be allowed to legally migrate. Id. at 330.

The Joint Statement, issued on May 2, 1995, declared that "Cuban migrants intercepted at sea by the United States and attempting to enter the United States will be taken to Cuba," rather than Guantanamo Bay or, presumably, other safe havens as contemplated in the Joint Communique. Id. at 328. The Migrant Accords laid the foundation for what came to be known as the Wet-Foot/Dry-Foot policy, whereby those Cubans who arrived on United States soil could seek asylum, parole, and

delivered by Fidel Castro, subsequent riots in the capital city of Havana, and a decree by the Castro regime that future attempts to go to the United States would not be contested, the Cuban flight to the United States reached nearly 40,000 in number in 1994—the highest level since the Marielito exodus of 1980. Id.

adjustment of status under the CAA, and those interdicted at sea would be returned to Cuba.

The specific contours of the Wet-Foot/Dry-Foot policy were largely established by a series of decisions made by the Department of Justice's Office of Legal Counsel and instructions issued by the INS and its successor agency, the United States Citizenship and Immigration Services ("USCIS"). On its own terms, the Joint Communique of 1994 would appear to cast doubt upon the ability of Cubans who entered the United States in "irregular ways" to gain parole or seek protection under the CAA. As the Communique states, "the United States has discontinued its practice of granting parole to all Cuban migrants who reach U.S. territory in irregular ways." Id. 329.

Deputy Attorney General Richard L. Shiffrin, however, stated in one key memorandum that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (the "IIRIRA"), Pub. L. No. 104-208, div. C, 110 Stat. 3009-546 (codified as amended in scattered sections 8 U.S.C. and 18 U.S.C.), "substantially amended" the INA, changing the terms by which aliens could be denied legal process in the United States:

> [T]he Reform Act has created the new category of "Aliens Treated as Applicants for Admission" under section 235 of the INA. An alien's classification within that category will now determine whether he must receive inspection, screening, and other attendant procedures . . . in

contrast to aliens who may be summarily repulsed or returned without any INA screening and procedural requirements.

Memorandum from Richard L. Shiffrin, Deputy Assistant Att'y Gen., U.S. Dep't. of Justice, to David A. Martin, Gen. Counsel, INS), Rights of Aliens Found in U.S. Internal Waters, 20 Op. O.L.C. 381, 381, 1996 WL 33101205, at *2 (1996)(emphasis in original) (citation omitted) [hereinafter the "Shiffrin Memorandum"].

Thus, while "aliens treated as applicants for admission" under the INA (as amended by the IIRIRA) include any

> alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters[.]

8 U.S.C. § 1225(a)(1) (2006), the Shiffrin Memorandum concluded that,

> unlanded aliens interdicted on internal waters[29] do not constitute "applicants for admission," and therefore need not be inspected or screened [.  I]t necessarily follows that such aliens are not entitled to removal proceedings (i.e., the amended INA's substitute for deportation proceedings) under section 240.[30]

1996 WL 33101205, at *3.  The necessary implication of Shiffrin's conclusion is that aliens found on land did constitute "applicants for admission" and were entitled to the attendant due process of law.  Furthermore, while the United States might not grant

---

[29]  "Internal waters" is obviously a reference to the territorial waters of the United States.

[30]  Codified as amended at 8 U.S.C. § 1229a.

automatic parole to all Cubans who reached United States territory irregularly, "as a practical matter, once a Cuban migrant is 'feet dry,' there is no place the United States Government can send the individual because, under the Migrant Accords, the Cuban Government will accept the repatriation of only those Cubans who [sic] the United States interdicts 'at sea.'" Lieutenant Commander Brian W. Robinson, Smuggled Masses: The Need for a Maritime Alien Smuggling Law Enforcement Act, Army Law., Aug. 2010, at 20, 29.

If a Cuban who physically arrives in the United States—i.e., has "dry feet"—is thus to be treated as an "applicant for admission," the question becomes one of the process he is due under United States law and policy. There was once a point of confusion among Immigration officers about the meaning of the word "admissible" in the language of the CAA quoted supra.[31] It appeared that Cubans who arrived in the United States at a place other than a designated Port-of-Entry could be inadmissible. This is because, under 8 U.S.C. § 1182(a)(6)(A)(i), "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."

---

[31] The confusion regarding the word "admissible" in the CAA was addressed by the Meissner Memorandum in 1999. It is not clear how long confusion or controversy surrounded this term.

To ensure that Cubans would not be deprived of CAA adjustment on this ground, then–INS Commissioner Doris Meissner announced that the "policy of the [INS/USCIS] is that the inadmissibility ground that is based on an alien's having arrived at a place other than a port-of-entry <u>does not</u> apply to CAA applicants." Meissner Memorandum at 1 (emphasis in original). Otherwise, "the purpose of the CAA would have been defeated." <u>Id.</u> at 2. Nonetheless, the Meissner Memorandum makes clear that this INS/USCIS "policy does not relieve the applicant of the obligation to meet all other eligibility requirements. In particular, [CAA] adjustment is available only to applicants who have been 'inspected and admitted or paroled into the United States.'" <u>Id.</u> (citation omitted). A Cuban "present without inspection, therefore, would not be eligible for CAA adjustment unless the [Cuban] first surrendered himself . . . into [INS/USCIS] custody and the [INS/USCIS] released the alien from custody pending a final determination of . . . admissibility." <u>Id.</u>

As Meissner noted, simply being "admissible" to the United States is not enough for a Cuban to qualify for adjustment of status under the CAA; the Cuban must, in the words of the CAA, also be "physically present in the United States" for at least one year.[32] CAA, Pub. L. No. 89-732, § 1, 80 Stat. at 1161. The expressed

---

[32] The CAA was amended by the Refugee Act of 1980, Pub. L. No. 96-212, § 203(i), 94 Stat. 102, 108. The 1980 Act reduced the "physical presence" requirement of the CAA from two years to one year.

policy of the USCIS ensures that the dry-foot Cuban will have the opportunity to so

remain in the United States:

> A native or citizen of Cuba who is present in the United States without having been inspected and admitted is eligible to apply for an initial parole at the USCIS field office having jurisdiction over the applicant's place of residence. Natives or citizens of Cuba need parole documentation in order to become eligible for benefits under the Cuban Adjustment Act . . . .
> . . . .
> The validity period of the initial parole must be one (1) year. This will allow natives or citizens of Cuba who have been physically present in the United States for at least one year to apply for adjustment of status under the CAA and seek employment authorization as an applicant for permanent residence while the adjustment of status application is pending.

Memorandum from Tracy Renaud, Chief, Office of Field Operations, USCIS, to Field Leadership, File No. HQ 70/10.10, Processing of Initial Parole Requests Presented by Natives or Citizens of Cuba to USCIS Field Offices 1, 2 (Mar. 4, 2008), available at http://www.uscis.gov/files/pressrelease/CubanParole_4Mar08.pdf (citation omitted).

As stated supra, parole is to be granted to an alien on the basis of "urgent humanitarian reasons" or a "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). While these standards may appear to be high ones, appearances may be deceiving. As the Meissner Memorandum explains, there exists a heavy presumption in favor of parole for Cuban refugees in the United States:

> In the absence of a disqualifying criminal record or other factors that would bar CAA adjustment, however, the on-going difficulty in actually removing aliens to Cuba and the availability of CAA adjustment should ordinarily weigh heavily in favor of a grant of parole. The [USCIS] may properly consider the avoidance of detention costs with respect to an alien whose actual removal is unlikely as a factor in determining, as a matter of discretion, that parole would yield "a significant public benefit." In similar fashion, the [USCIS] may properly consider the availability of CAA adjustment as a factor in determining, as a matter of discretion, that an "urgent humanitarian reason" justifies a grant of parole.[33]

Meissner Memorandum 2–3 (citation omitted).

### B.

Gustavo Dominguez is a native of Cuba and a naturalized United States citizen. At the time of the events that led to the indictment in this case, Dominguez was a sports agent. Through his company, Total Sports International ("TSI"), he had represented over 100 baseball players, many of whom played for Major League Baseball teams. This case involves five Cuban baseball players: Francisely Bueno-Trueba, Osbek Castillo-Perez, Allen Guevara-Perez, Osmany Masso-Arredondo, and Yoankis Turino-Montalno.

On August 22, 2004, they were brought from Cuba to the Florida Keys by boat and taken to the residence of a former Major League player, a Cuban national, in

---

[33] In this case, the Government presented no evidence to the effect that a "disqualifying criminal record or other factors" would bar any of the five Cuban players from obtaining CAA adjustment of status to lawful permanent residence.

Miami. Dominguez was informed of the players' arrival, agreed to represent the players, and arranged for their transportation to California.

Throughout this process, Dominguez retained the assistance of an experienced immigration law attorney. Shortly after the players arrived in California, Stephen Schneider, Dominguez's TSI partner and a lawyer, arranged for Humberto Gray, an immigration attorney, to process the players through immigration.[34] Gray told Dominguez that he set up an appointment for the players at the USCIS Los Angeles office. On November 19th, Gray and Dominguez accompanied the players to the USCIS office to apply for asylum and "to get their paroles." They were paroled. Gray thereafter represented them before the USCIS.

Because the players were presumptive refugees, all of this happened precisely as set out by the CAA, the Wet-Foot/Dry-Foot policy, and the Meissner Memorandum; to wit, the Cuban aliens arrived in the United States at a location other

---

[34] Testifying in the Government's case, Schneider said that Gray had done immigration work for TSI players since the late 1990s. During that time, Dominguez, through TSI, had represented 30 to 40 Cuban players; "probably 15" of those eventually reached the Major Leagues. According to his firm's website, Gray is "recognized as an expert on Immigration Law" and his firm, Humberto R. Gray, P.L.C.,

> has represented many top foreign players playing in Major League Baseball. This esteemed list includes, [sic] Pedro Martinez, Ramon Martinez, Raul Mondesi, Andres Galarraga, Larry Walker, Jose Offerman, Ismael Valdez, Wilton Guerrero, Deivi Cruz, Ramiro Mendoza, Pedro Astacio and Mariano Rivera, to name a few.

Gray Law, http://www.graylaw.com/index.html (last visited September 12, 2011).

than a designated port of entry, made their way to immigration authorities, and were then paroled. These events, however, gave rise to the current prosecution for conspiracy to smuggle, attempted smuggling, smuggling in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(ii); transporting aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii); and harboring aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(iii).

C.

Anticipating that Dominguez would frame a defense to those charges based on "Legislative and Executive Branch immigration policies" that apply specifically to Cubans, namely the CAA, the Wet-Foot/Dry-Foot policy, and the Meissner Memorandum, the Government moved the district court in limine to bar Dominguez from referring to these policies in the presence of the jury at trial. In response, Dominguez argued that, if these policies did not preclude his conviction, they were at least relevant to the mens rea element of the charged offenses.

According to Dominguez, the policies the Government sought to exclude enable undocumented Cubans who enter the United States at a location not designated as a "Port-of-Entry" by the Attorney General and without valid entry documents to apply for permanent residence status. Dominguez represented that he was aware of these policies when he had the five players transported to California, trained, observed by Major League baseball scouts, and presented to the federal

72

immigration authorities. In this light, he contended, he lacked the requisite criminal intent to violate the law.

The district court granted the Government's motion.[35] The court rejected the notion that the Wet-Foot/Dry-Foot policy and the CAA provided a legal defense to any of the pending charges against Dominguez, holding that the policy and the CAA were "irrelevant" for such purpose. As for Dominguez's <u>mens rea</u> argument, the court held that Dominguez's beliefs about the law were "irrelevant to his intent" to violate 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(ii). The court explained: "[t]he <u>mens rea</u> presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it conflict with the related presumption, deeply rooted in the American legal system, that, ordinarily, ignorance of the law or a mistake of law is no defense to criminal prosecution." Order Granting Gov't Mot. <u>In Limine</u> 2, Mar. 14, 2007 (quoting <u>Staples v. United States</u>, 511 U.S. 600, 622 n.3, 114 S. Ct. 1793, 1805 n.3, 128 L. Ed. 2d 608 (1994) (Ginsburg, J., concurring in the judgment) (citation and internal quotation marks omitted)). As such, the court implicitly found that Dominguez's knowledge of the CAA and the Wet-Foot/Dry-Foot policy was not relevant to his culpability.

---

[35] In granting the Government's motion, the district court simultaneously denied Dominguez's request for a hearing on the motion.

The district court's order governed the conduct of Dominguez's trial. That is, the order precluded Dominguez from (1) testifying that he arranged to have the players brought to California for what he thought was a lawful purpose, to enable them to attain asylum and parole in conformance with the immigration policy established by the CAA, Wet-Foot/Dry-Foot policy, and Meissner Memorandum; and (2) presenting the expert testimony of a retired Immigration Judge to explain that immigration policy. The jury received the case without hearing a word about the policy from the witness stand or the court's instructions on the law. Moreover, the instructions the court actually did give on the elements of the smuggling offenses did not contain an instruction on criminal intent.[36]

---

[36] Nor did the court's instructions on the transporting and harboring offenses contain a criminal intent instruction.

## II.

I now turn to the court's affirmance of the district court's treatment of the <u>mens rea</u> defense Dominguez attempted to present in countering the charges that he conspired to violate and violated 8 U.S.C. § 1324(a)(2)(B)(ii). The court first recites the language of § 1324(a)(2),[37] noting that a defendant must know or recklessly disregard "the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States" and that a smuggling offense occurs "regardless of any official action which may later be taken with respect to such alien," so long as the defendant brings or attempts to bring the alien to the United States. <u>Ante</u> at 29. The court highlights the <u>mens rea</u> requirement for the first element, that the defendant know or recklessly disregard the alien's status, and points out that Congress omitted any <u>mens rea</u> for the second element of the offense. <u>Ante</u>. Then, the court notes that there is a presumption that each statutory element contains some level of scienter. <u>Ante</u>. The court concludes that:

> [A] court may treat the <u>mens rea</u> Congress provided in the statute as modifying each element that follows it. Thus, we decide a defendant must <u>knowingly</u> bring an alien to the United States.

---

[37] See <u>supra</u> note 4, for the text of 8 U.S.C. § 1324(a)(2).

75

Ante (emphasis added)[38]

To support its conclusion that the statutory language it highlighted rendered Dominguez's criminal intent irrelevant, the court points to the legislative history of the revisions Congress made to the statute in the wake of Zayas-Morales, finding that the legislative history explains that Congress intended to overrule Zayas-Morales and "expand the scope of activities proscribed by federal law to reach the conduct of those participating in such operations as the Mariel boatlift." Ante at 32–33.

The court also highlights the opinions from three cases to establish that Congress intended to omit criminal intent as an element of the § 1324(a)(2)(B)(ii) offense. Ante at 30. First, the court cites United States v. Mussaleen, 35 F.3d 692, 698 (2d Cir. 1994), for the proposition that "reckless disregard" or knowledge can satisfy the requirement of a mens rea element. Ante at 31. The challenge raised in that case, however, focused on whether "reckless disregard" could be a sufficient mens rea, or whether actual knowledge was necessary. Mussaleen, 35 F.3d at 698. I do not question that a defendant who acts in reckless disregard of an alien's status can be convicted under the statute; rather, the central issue is whether the Government

---

[38] The question facing the court is not an argument that "the evidence supporting [Dominguez's] smuggling convictions [was] insufficient." Rather, the argument is that the district court erred in ruling Dominguez's mens rea defense irrelevant.

must also prove criminal intent for the second element. Thus, <u>Mussaleen</u> addressed a different concern than at what is issue here.

Second, the court discusses <u>United States v. Nguyen</u>, 73 F.3d 887 (9th Cir. 1995). <u>Ante</u> at 33–34. In <u>Nguyen</u>, the court found that 8 U.S.C. § 1324(a)(1), a felony, requires proof of criminal intent—although the statutory language did not expressly require it—but questioned, in dicta, whether the <u>misdemeanor</u> provision of § 1324(a)(2) required the same proof. 73 F.3d at 892–93. Here, we deal with the <u>felony</u> provision.

Finally, the court points to a concurring opinion in <u>United States v. Garcia-Cordero</u>, 610 F.3d 613, 619 (11th Cir. 2010) (Korman, J., concurring). <u>Ante</u> at 34. In <u>Garcia-Cordero</u>, the concurring opinion contains this comment: "Consequently, Congress enacted 8 U.S.C. § 1324(a)(2)[B], which does not require general criminal intent, to make it a <u>misdemeanor</u> to engage in conduct of the kind at issue in the Mariel Freedom Flotilla cases." 610 F.3d at 619 (Korman, J. concurring) (emphasis added). Notably, the concurring opinion cites no case in support of the above-quoted proposition.

In sum, no opinion cited by the court states that criminal intent is not an element of the § 1324(a)(2)(B) <u>felony</u> offenses.

## III.

I must respectfully disagree with the court's reasoning and conclusion that the § 1324(a)(2)(B) felony offenses do not require proof of criminal intent. In the simplest terms, the court today creates a circuit split on this issue. In doing so, it rejects the reasoned analysis of our sister circuits that have analyzed this provision and the nearly identical language found in the § 1324(a)(1) felony offenses. For the reasons set forth below, I do not read the statute to eliminate a general criminal intent mens rea, but instead conclude that proof of general criminal intent is an element of the § 1324(a)(2)(B) felony offenses.[39]

---

[39] In reaching its conclusion, the court expressly rejects inclusion of criminal intent, holding that "a specific intent to violate the law is not required." Ante at 30. To be clear, I would not require proof of specific criminal intent. Rather, like our decision in Zayas-Morales, and the majority of decisions from other circuits who require mens rea, I would instead require proof of general criminal intent. This requires more than a showing that the defendant acted knowingly, see Eleventh Circuit Pattern Jury Instructions (Criminal) at 35, Basic Offense Instruction 9.1A ("The word 'knowingly' means that an act was done voluntarily and intentionally and not because of a mistake or by accident"), but less than acting with specific intent. The Eleventh Circuit Pattern Jury Instructions (Criminal) at 35, Basic Offense Instruction 9.1A, explains the meaning of general criminal intent:

> The word "willfully" means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law. While a person must have acted with the intent to do something the law forbids before you can find that the person acted "willfully," the person need not be aware of the specific law or rule that [his] [her] conduct may be violating.

The Eleventh Circuit Pattern Jury Instructions (Criminal) at 37, Basic Offense Instruction 9.1B, also explains the instruction for more rigorous standard of specific intent, requiring proof that "the act was done voluntarily and purposely with the specific intent to violate a known legal duty, that is, with the intent to do something the law forbids." The comments following Basic Offense

78

A.

1.

The analysis of the <u>mens rea</u> issue appropriately begins with the language of the statute, 8 U.S.C. § 1324(a)(2)(B).  <u>See</u> <u>Staples v. United States</u>, 511 U.S. 600, 605, 114 S. Ct. 1793, 1797, 128 L. Ed. 2d 608 (1994).  The challenge the court faces here is that the language provides little guidance; without question, Congress did not expressly eliminate the <u>mens rea</u> requirement.  Rather, the language of the statute merely makes it unlawful for a person who,

> knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to the United States in any manner whatsoever, such alien regardless of any official action which may later be taken with respect to such alien.

8 U.S.C. § 1324(a)(2).

Considered in light of legislative history, the court concludes that Congress intended to omit criminal intent as an element of the § 1324(a)(2)(B)(ii) offenses.[40]  <u>Ante</u> at 35.  The court's analysis, however, reaches its <u>mens rea</u> holding without considering the "interpretative presumption" that proof of <u>criminal intent</u> or in other

Instruction 9.1A provide a helpful distinction between the two definitions of "willful."

[40] The court's analysis fails to recognize the distinction between the § 1324(a)(2) misdemeanor offense and the § 1324(a)(2)(B)(ii) felony offense.  Here, Dominguez was tried and convicted for the felony offense.

79

words, an evil mind, is required to convict a defendant of a crime, such as smuggling, which has its origin in the common law,[41] United States v. U.S. Gypsum Co., 438 U.S. 422, 437, 98 S. Ct. 2864, 2873, 57 L. Ed. 2d. 854 (1978) ("Although Blackstone's requisite "vicious will" has been replaced by more sophisticated and less colorful characterizations of the mental state required to support criminality intent generally remains an indispensable element of a criminal offense." (internal citation omitted)),[42] for each element of the offense, United States v. X-Citement Video, Inc., 513 U.S. 64, 72, 115 S. Ct. 464, 469 (1994) ("[Supreme Court precedent] instructs that the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct."). The presumption articulated by the U.S. Gypsum Court draws from the Court's earlier decisions in

---

[41] Amongst his "Offences Against Public Trade," Blackstone identified the crime of "Smuggling," which he classified as a felony. See 4 William Blackstone, Commentaries *155–56 (describing the common law crime of smuggling).

[42] This presumption does not apply in prosecutions for public welfare or regulatory offenses. See Staples v. United States, 511 U.S. 600, 606–07, 114 S. Ct. 1793, 1797–98, 128 L. Ed. 2d 608 (1994) (noting that typically these prosecutions involve regulation of potentially harmful items or in areas of public health or safety); see also Nguyen, 73 F.3d at 891 n.1 ("The government does not contend that section 1324(a)(1)(A) is a public welfare statute, nor could it. The 'public welfare' exception does not extend to offenses derived from the common law."); Holdridge v. United States, 282 F.2d 302, 310 (8th Cir. 1960) (Blackmun, J.) ("[W]here a federal criminal statute omits mention of intent and . . . where the penalty is relatively small, where conviction does not gravely besmirch, [and] where the statutory crime is not one taken over from the common law, . . . the statute can be construed as one not requiring criminal intent." (emphasis added)). Without question, § 1324(a)(2) does not create a public welfare or regulatory offense.

Morissette v. United States, 342 U.S. 246, 72 S. Ct. 240, 96 L. Ed. 288 (1952),[43] and

Dennis v. United States, 341 U.S. 494, 500, 71 S. Ct. 857, 862, 95 L. Ed. 1137

(1951).[44]

In Dennis, decided a year before Morissette, the Court observed that "[t]he

existence of a mens rea is the rule of, rather than the exception to, the principles of

Anglo-American criminal jurisprudence." 341 U.S. at 500, 71 S. Ct. 857 at 962. In

Morrisette, the Court explained the origin of the judiciary's practice of finding

legislative intent to include criminal intent as a requirement for a felony conviction,

even where the statute was silent as to the requirement. The Court in Morissette

noted:

> As the states codified the common law of crimes, even if their
> enactments were silent on the subject, their courts assumed that the
> omission did not signify disapproval of the principle but merely
> recognized that intent was so inherent in the idea of the offense that it
> required no statutory affirmation. Courts, with little hesitation or
> division, found an implication of the requirement as to offenses that
> were taken over from the common law.

342 U.S. at 252, 72 S. Ct. at 244.

---

[43] Morissette v. United States, 342 U.S. 246, 251–52, 72 S. Ct. 240, 241, 96 L. Ed. 288 (1952) ("Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil.").

[44] Dennis v. United States, 341 U.S. 494, 500, 71 S. Ct. 857, 862, 95 L. Ed. 1137 (1951) ("It has been suggested that the presence of intent makes a difference in the law when an 'act otherwise excusable or carrying minor penalties' is accompanied by such an evil intent.").

The Court tacitly, if not expressly, approved this practice again in 1985 in Liparota v. United States, reiterating the fundamental principle that criminal offenses without a mens rea element are "generally disfavored." 471 U.S. 419, 426, 105 S. Ct. 2084, 2088, 85 L. Ed. 2d 434 (1985). In sum, "far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement." U.S. Gypsum, 438 U.S. at 438, 98 S. Ct. at 2874. That is, more than a "simple omission" is necessary to rebut the interpretative presumption that proof of criminal intent is required for a felony conviction. As I will explain, there is nothing in the text or the legislative history that is sufficient to rebut that presumption for § 1324(a)(2)(B).

2.

Congress did not overcome this presumption for three reasons: (1) the text and legislative history are not sufficiently clear to infer any implied intent to eliminate criminal intent, (2) the specific language Congress chose to use in the 1986 revision mirrors language that courts have overwhelmingly held to include a criminal intent mens rea, and (3) the potential penalties imposed for a violation under this provision are severe enough to indicate that Congress intended to retain the requirement to show proof of criminal intent.

First, the statutory language itself is unclear, as Congress simply omitted any mens rea element in reference to the "brings to or attempts to bring to" element. Also, nothing in the legislative history is clear enough to overcome the presumption that criminal intent is an element under § 1324(a)(2)(B). The court essentially hinges its interpretation of the statute on one portion of the legislative history. Ante at 31–34. After reviewing the holdings of the district court in United States v. Anaya, 509 F. Supp. 289 (S.D. Fla. 1980), aff'd on other grounds sub nom. United States v. Zayas-Morales, 685 F.2d 1272 (11th Cir. 1982), and Zayas-Morales, the House committee stated:

> The Committee is convinced that this gap in current law must be closed. Without the threat of criminal prosecution, there is no effective way to deter potential transporters from inundating U.S. ports of entry with undocumented aliens. As happened during the Mariel episode, the United States would be forced to expend extraordinary amounts of money and human resources in processing, monitoring, caring for and giving hearings to exorbitant numbers of people.

H.R. Rep. No. 99-682(I) at 20 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5670.

I am not convinced that Congress authorized the courts to read the statute as eliminating proof of an evil mind for a felony conviction under § 1324(a)(2)(B).[45]

---

[45] As the Ninth Circuit in Nguyen explained, "we cannot accept the government's leap from this premise to the conclusion that Congress intended to dispense with the mens rea requirement inferred by the Eleventh Circuit in Zayas-Morales." Nguyen, 73 F.3d at 892 (reviewing history in light of changes to § 1324(a)(1)); see also United States v. Barajas-Montiel, 185 F.3d 947, 953 (9th Cir. 1999) (concluding that "nothing, in the statute or legislative history, indicates that Congress intended to dispense with a mens rea requirement for the felony offense

The unexplained "gap" referred to in the legislative history is ambiguous at best. While I do not doubt that the statutory revisions made in 1986 were intended to "expand the scope of activities proscribed," 1986 U.S.C.C.A.N. at 5670, the "gap" could focus on any number of issues raised by the decisions of the district court and this court.[46] This bare assertion alone is not sufficient. My reading of the statute is in accord with the other courts who have interpreted the legislative history. See part III.A.3, infra.

Second, § 1324(a)(2)(B) should be read as requiring a criminal intent mens rea element because Congress intentionally chose to use language in the 1986 revisions that federal courts have consistently interpreted to include criminal intent. The Supreme Court has held that "Congress will be presumed to have legislated against the background of our traditional legal concepts which render intent a critical factor," and "absence of contrary direction [will] be taken as satisfaction with widely accepted definitions, not as a departure from them." U.S. Gypsum, 438 U.S. at 437, 98 S. Ct. at 2873 (alteration in original) (quoting Morissette, 342 U.S. at 263, 72 S. Ct. at 250).

of violating 8 U.S.C. § 1324(a)(2)(B)").

[46] It goes without saying that there are inherent problems with excessive reliance on ambiguous legislative history. See Polycarpe v. E&S Landscaping Service, Inc., 616 F.3d 1217, 1224 (11th Cir. 2010) (per curiam) ("Before proceeding, we must note that severe problems attend the use of legislative history in statutory interpretation; its analysis is a practice that we seek regularly to avoid." (citing United States v. Fields, 500 F.3d 1327, 1333-35 (11th Cir. 2007) (Carnes, J., concurring))).

The Supreme Court's decision in <u>Liparota</u>, is one illustration of this point.[47]

<u>Liparota</u> involved a "food stamps" prosecution. The defendant was charged with acquiring and possessing food stamps in violation of 7 U.S.C. § 2024(b)(1). That section provided at the time and in relevant part: "[W]hoever knowingly uses, transfers, acquires, alters, or possesses coupons . . . in any manner not authorized by this Act or the regulations issued pursuant to this Act[.]" 7 U.S.C. § 2024(b) (1981).

The Government's case consisted of the testimony of an undercover agent of the Department of Agriculture who had gone to the defendant's sandwich shop and, on three occasions, had purchased a total of $1,195 of food stamps for $800. The defendant argued that this testimony, standing alone, was insufficient to establish that he had violated § 2024(b)(1); he argued that the Government had to prove that he knew he was violating a federal law when he purchased the food stamps. The district court disagreed and instructed the jury that,

> the Government had to prove that the Defendant acquired and possessed food stamp coupons for cash in a manner not authorized by federal statute or regulations and that the Defendant knowingly and wilfully (sic) acquired the food stamps.

---

[47] There are numerous other illustrations of courts reading in a criminal intent <u>mens rea</u> element to similar statutes. For another example, the statute in <u>Morissette</u> provided: "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another . . . [a] thing of value of the United States . . . ." 18 U.S.C. § 641. The Supreme Court held that criminal intent was an essential element of the crime in any prosecution for "knowingly convert[ing]" property of the United States. <u>Morissette</u>, 342 U.S. at 275, 72 S. Ct. at 256.

Liparota, 471 U.S. at 422, 105 S. Ct. at 2086 (internal quotations omitted).[48]

The defendant was convicted, and, on appeal, the Seventh Circuit affirmed. Id. The Supreme Court granted certiorari to determine "whether in a prosecution under [§ 2024(b)(1)] the Government must prove that the defendant knew that he was acting in a manner not authorized by statute or regulations." Id. at 420–21, 105 S. Ct. at 2086. The answer was a matter of statutory interpretation, and the Court, disagreeing with the Government, held that such knowledge was an element of the offense. In a § 2024(b)(1) prosecution, the Court concluded that the jury must be informed of what the statute and regulations proscribe, then instructed to determine whether the defendant knew that his conduct was unlawful. Id. The Court elaborated on its holding:

> [T]he Government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations. This holding does not put an unduly heavy burden on the Government in prosecuting violators of § 2024(b)(1). To prove that petitioner knew that his acquisition or possession of food stamps was unauthorized, for example, the Government need not show that he had knowledge of specific regulations governing food stamp acquisition or possession. Nor must the Government introduce any extraordinary evidence that would conclusively demonstrate petitioner's

---

[48] Although the instruction contained the word willfully, it appears that it was not used in this context to confer any criminal intent element given that the Court notes, "[p]etitioner objected that this instruction required the jury to find merely that he knew that he was acquiring or possessing food stamps; he argued that the statute should be construed instead to reach only 'people who knew that they were acting unlawfully.'" Liparota, 471 U.S. at 422–23, 105 S. Ct. at 2086.

state of mind. Rather, as in any other criminal prosecution requiring mens rea, the Government may prove by reference to facts and circumstances surrounding the case that petitioner knew that his conduct was unauthorized or illegal.

Id. at 433–34, 105 S. Ct. at 2092–93 (footnote omitted).

Moreover, several of our sister circuits have read this type of statutory language and structure to include "willfully" to modify the verb in § 1324 offenses, rather than applying, as the court does here, the "knowing" mens rea that is applicable only to the first element of the offense. For example, in United States v. Parmelee, 42 F.3d 387 (7th Cir. 1994), the Seventh Circuit concluded that the predecessor to § 1324(a)(1)(A)(ii) required that an element of criminal intent—that the defendant act willfully—be read into the statute.[49] See id. at 390. The Parmelee court reached this conclusion because to hold otherwise would lead to "sweeping liability." Id. at 39. Numerous other circuits follow the same approach to read in "willfully" as an element, rather than requiring only that the defendant act "knowingly." See United States v. Chavez-Palacios, 30 F.3d 1290, 1294 (10th Cir. 1994) (holding that there

---

[49] The Seventh Circuit specifically stated,

[w]e have no question that section 1324(a)(1)(B) implicitly requires the government to prove beyond a reasonable doubt not only that the defendant knew the alien he transported had entered this country in violation of immigration law, but also that the defendant knowingly transported the alien to further that violation, that is, acted willfully.

Parmelee, 42 F.3d at 390.

is a "willful" <u>mens rea</u> element required under statute with identical language to current § 1324(a)(1)(A)(ii)); <u>United States v. Diaz</u>, 936 F.2d 786, 788 (5th Cir. 1991) (reading in "willful" <u>mens rea</u> for the transporting provision that is now in § 1324(a)(1)(A)(ii)); <u>United States v. Medina-Garcia</u>, 918 F.2d 4, 7 (1st Cir. 1990) (addressing <u>mens rea</u> for transporting provision now in § 1324(a)(1)(A)(ii), which requires that the defendant acted "willfully"); <u>United States v. Hernandez</u>, 913 F.2d 568, 569 (8th Cir. 1990) (per curiam) (interpreting § 1324(a)(1)(A)(ii) to find that the defendant acted "willfully in furtherance" of alien's violation of the law was a required element); <u>United States v. 1982 Ford Pick-Up</u>, 873 F.2d 947, 951 (6th Cir. 1989) (concluding that the Government must prove "the defendant willfully transported an illegal alien" under § 1324(a)(1)(A)(ii)); <u>United States v. Morales-Rosales</u>, 838 F.2d 1359, 1360 (5th Cir. 1988) (holding that Government must prove that defendant acted "willfully" to prove a violation of the transporting provision), <u>overruled on other grounds by</u> <u>United States v. Longoria</u>, 298 F.3d 367 (5th Cir. 2002); <u>United States v. Merkt</u>, 764 F.2d 266, 272 (5th Cir. 1985) (affirming a jury instruction that included a "willful" element for the transporting violation). <u>But see</u> <u>United States v. De Jesus-Batres</u>, 410 F.3d 154, 162 (5th Cir. 2005) (rejecting <u>Nguyen</u> while interpreting the harboring provision in § 1324(a)(1)(A)(iii), but offering no explanation other than "[t]his circuit follows a different rule and has held,

88

as to similar offenses, that proof of specific intent to violate immigration laws is not required."). That other circuits have interpreted provisions with the same language and structure to include a "willful" element is instructive to the approach we should take in interpreting this provision. Namely, it is highly persuasive that other courts have consistently rejected the interpretation suggested by the court today—that we should read "knowingly" to apply to each element—and instead concluded that criminal intent is the proper mens rea.

Thus, it is fair to conclude that when Congress chose the particular language of § 1324(a)(2)(B), it did so with full knowledge of the widespread practice to interpret such language to include a criminal intent element.[50] See Morissette, 342 U.S. at 252, 72 S. Ct. at 244. Congress could have expressly indicated that a general criminal intent mens rea element was not required for the "bring" or "attempts to bring" element in a § 1324(a)(2)(B) prosecution; instead, it left a blank slate for us

---

[50] In Morissette, the Supreme Court specifically noted,

> [a]nd where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.

Morissette, 342 U.S. at 263, 72 S. Ct. at 250.

89

to interpret. This omission does not establish that Congress intended to eliminate criminal intent.

Finally, a third factor that weighs in favor of reading a criminal intent element into § 1324(a)(2)(B) is that Congress prescribed harsh penalties for its violation. The Supreme Court has held that the severity of potential punishment is a major factor in finding whether Congress intended to omit an evil-mind requirement. See Staples, 511 U.S. at 616, 114 S. Ct. at 1802 ("Historically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with mens rea."); see also Morissette, 342 U.S. at 256, 72 S. Ct. at 246 (noting that in statutes without a mens rea, the "penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation."). The imposition of significant penalties without any requirement of criminal intent is "incongruous." Staples, 511 U.S. at 617, 114 S. Ct. at 1803.

The severity of the penalties authorized under § 1324(a)(2)(B) clearly indicates that Congress intended a mens rea element. Section 1324(a)(2)(B)(ii), addressing an "offense done for the purpose of commercial advantage or private financial gain," authorizes imprisonment for a first- or second-time violation of "not less than 3 nor more than 10 years," and "not less than 5 nor more than 15 years" for subsequent

violations. See § 1324(a)(2)(B)(ii).[51] These penalties are a far cry from the petty

punishments, such as a fine or short jail sentence, typically associated with a crime

that does not require mens rea. See Staples, 511 U.S. at 616, 114 S. Ct. at 1803

("Certainly, the cases that first defined the concept of the public welfare offense

almost uniformly involved statutes that provided for only light penalties such as fines

or short jail sentences, not imprisonment in the state penitentiary."); see also

Commonwealth v. Raymond, 97 Mass. 567 (1867) (involving a fine of up to $200 or

six months in jail, or both); Commonwealth v. Farren, 91 Mass. 489 (1864)

(discussing a penalty limited to a fine); People v. Snowburger, 71 N.W. 497 (Mich.

1897) (addressing penalties of only a fine of up to $500 or incarceration in county

jail).

Here, Congress authorized more severe punishments under § 1324(a)(2)(B)

than it did for violations under the current version of § 1324(a)(1)(A) and the version

of § 1324(a)(1) that existed in Zayas-Morales.[52] In Nguyen, one of the cases the court

---

[51] The district court sentenced Dominguez to concurrent prison terms of five years.

[52] See § 1324(a)(1)(B)(i) (describing punishment and, for all offenses other than those involving serious bodily injury, a threat to someone's life, or the death of someone, noting that "in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under Title 18, imprisoned not more than 10 years, or both"); § 1324(a)(1) (1976) (stating that violators "shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this

cites, ante at 33–34, the Ninth Circuit's holding depended in part on the severity of the penalties for violating § 1324(a)(1)(A). Nguyen, 73 F.3d at 892. In many ways, there is a more persuasive argument that Congress intended an element of criminal intent in § 1324(a)(2)(B) given that the mandatory minimum prison sentence of three or five years and the maximum sentence of ten or fifteen years creates a more punitive scheme than the one in § 1324(a)(1)(A).[53]

In short, the greater the penalty, the more Congress is aware that, if it intends to eliminate criminal intent, it must do so clearly. If the district court decided to run Dominguez's sentences consecutively, the total sentence could have been as low as forty-seven years and as high as one hundred thirty-five years.[54] The potential penalty authorized by Congress under § 1324(a)(2)(B)(ii) is great indeed. There is nothing

---

subsection occurs").

[53] In its analysis, the Ninth Circuit heavily relied upon the severity of the potential punishments in concluding that § 1324(a)(2)(B) contained some mens rea requirement. See Barajas-Montiel, 185 F.3d at 953 (noting that the exact same concerns at issue in Nguyen are at issue in any analysis of § 1324(a)(2) because of "[t]he substantial overlap between the felony statutes and the serious penalties for their violation."). The court dismisses Barajas-Montiel as unpersuasive, yet cites Nguyen with approval. I do not attempt to reconcile this inconsistency, concluding instead that both Barajas-Montiel and Nguyen are instructive.

[54] These figures include five years on the conspiracy count, 18 U.S.C. § 371. The 47 years' total sentence incorporates the three-year and five-year mandatory minimums prescribed by 8 U.S.C. § 1324(a)(2)(B); the 135 years' total sentence incorporates the maximum sentences prescribed by that provision. These totals are, of course, theoretical. The mandatory minimums § 1324(a)(2)(B) prescribes required the court to impose sentences above the sentencing range prescribed by the applicable Sentencing Guideline, U.S. Sentencing Guidelines Manual § 2L1.1.

in the language of § 1324(a)(2)(B)(i),(ii), or (iii) or the legislative history indicating a legislative intent to omit criminal intent as an element of the offenses, let alone a clear statement one would expect given the severe penalties authorized. Thus, the penalties the statute imposes weigh heavily in favor of a finding that Congress intended that general criminal intent remain an element.

Finally, I note that in instances where there is ambiguity concerning the scope of a criminal statute, courts traditionally apply the longstanding rule of lenity. See Barajas-Montiel, 185 F.3d at 952–53 ("If after examining the statutory language and the legislative history we perceive any ambiguity regarding Congress's intent to require a showing of criminal intent, we will resolve the ambiguity by implying a mens rea element." (quoting Nguyen, 73 F.3d at 890–91)). Even absent the reasons why I conclude that mens rea is an element of the § 1324(a)(2) offenses, at a bare minimum, the considerable ambiguity as to the inclusion of that element counsels that we apply the rule of lenity. See U.S. Gypsum, 438 U.S. at 437, 98 S. Ct. at 2873; see also Liparota, 471 U.S. at 427, 105 S. Ct. at 2089 ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability."); United States v. Bass, 404 U.S. 336, 348, 92 S. Ct. 515, 523, 30 L. Ed. 2d 488 (1971) ("[B]ecause of the seriousness of criminal

penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity.").

3.

The approach I endorse is confirmed by a clear majority of circuits that have considered whether criminal intent is an element of the §§ 1324(a)(1) and 1324(a)(2) offenses.[55] My research reveals that only the Ninth Circuit has answered the question regarding the § 1324(a)(2) offenses. Other courts have addressed the question regarding the § 1324(a)(1) offenses; as a whole, their holdings support my interpretation.

The Ninth Circuit in Barajas-Montiel confronted the § 1324(a)(2)(B) issue and concluded that criminal intent is an element of the offense. Barajas-Montiel, 185

---

[55] Today the court addresses this question under the § 1324(a)(2)(B)(ii) offenses, but none of the cases it cites provides any significant analysis of this issue. See United States v. Garcia-Cordero, 610 F.3d 613, 619 (11th Cir. 2010) (Korman, J., concurring) (asserting, without any citation for support that, "[c]onsequently, Congress enacted 8 U.S.C. § 1324(a)(2), which does not require general criminal intent, to make it a misdemeanor to engage in conduct of the kind at issue in the Mariel 'Freedom Flotilla' cases."); United States v. Mussaleen, 35 F.3d 692, 698 (2d Cir. 1994) (addressing an entirely different issue); see also Nguyen, 73 F.3d at 892–94 (holding that § 1324(a)(1)(A) requires proof of criminal intent because nothing in the statute or legislative history indicated that Congress "intended to dispense with the mens rea requirement assumed to be an element of every common law offense" and drawing a distinction between the felony § 1324(a)(1) and the misdemeanor § 1324(a)(2), in dicta, intimating that Congress may have dispensed with the mens rea requirement for the misdemeanor penalty under § 1324(a)(2)); but see Barajas-Montiel, 185 F.3d at 953 (rejecting any attempt in Nguyen to draw a distinction between § 1324(a)(1) and § 1324(a)(2)(B)).

F.3d at 952. In that case, the court drew on its decision in Nguyen, see id. (reviewing the text and legislative history of § 1324 to conclude that there was insufficient proof Congress intended to dispose of the mens rea requirement for common law offenses, noting that "[c]ertainly there is nothing in the legislative history suggesting a desire to do so.") (quoting Nguyen, 73 F.3d at 893)), and held that the reasoning of Nguyen applies with equal force to § 1324(a)(2)(B). Barajas-Montiel, 185 F.3d at 953. In so holding, the court emphasized the lack of clarity in the legislative history, the similarity between offenses under § 1324(a)(1) and the felony provisions of § 1324(a)(2)(B), and the potential for harsh penalties. Id. at 952–53 ("Without a specific intent instruction, the jury does not have to consider whether a defendant intended to violate immigration laws, and therefore the jury could conceivably believe that they had to convict . . . where the defendant . . . had plausible claims that he nevertheless lacked the intent to violate the law.").

Although not precisely on point, other circuits have almost uniformly interpreted other § 1324(a)(1) provisions by reading in an element of criminal intent. As noted above, the Ninth Circuit has held that the § 1324(a)(1)(A)(i) "bringing in" felony offense includes an element of criminal intent. See Nguyen, 73 F.3d at 894 (reading in mens rea for § 1324(a)(1)(A)(i)). Similarly, the First, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Circuits have read in criminal intent for the §

95

1324(a)(1)(A)(ii) transporting offense. See Parmelee, 42 F.3d at 390; Chavez-Palacios, 30 F.3d at 1294 (holding that there is a mens rea element required under § 1324(a)(1)(A)(ii)); Diaz, 936 F.2d at 788 (reading in mens rea for transporting offense now in § 1324(a)(1)(A)(ii)); Medina-Garcia, 918 F.2d at 7–8 (addressing mens rea for transporting offense now in § 1324(a)(1)(A)(ii)); Hernandez, 913 F.2d at 569 (per curiam) (interpreting § 1324(a)(1)(A)(ii)); 1982 Ford Pick-Up, 873 F.2d at 951 (concluding that the Government must prove "that the defendant willfully transported an illegal alien with the specific intent of supporting the alien's illegal presence" under § 1324(a)(1)(A)(ii)); Morales-Rosales, 838 F.2d at 1360 (discussing mens rea for transporting offense). In addition, the Ninth Circuit has also held that criminal intent is a required element for the § 1324(a)(1)(A)(iii) harboring offense. See United States v. Chang Guo You, 382 F.3d 958, 966 (9th Cir. 2004) ("The court instructed the jury that it must find that Appellants had acted with 'the purpose of avoiding [the aliens'] detection by immigration authorities.' This instruction is synonymous with having acted with necessary intent as required in Barajas-Montiel and Nguyen.") (emphasis and alteration in original).

## B.

Applying the tools courts use in determining whether a criminal statute requires criminal intent and considering the decision-making reflected in the case law, I am

96

lead to the conclusion that § 1324(a)(2)(B) must contain an element of criminal intent. The court, however, arrives at a different conclusion, believing instead that to require proof of criminal intent is contrary to the plain language and legislative history of the statute and functionally eliminates the "reckless disregard" language. Ante at 31. While initially appealing, the court's analysis withers under close scrutiny.

As an initial matter, the statutory language is silent as to what the requisite mens rea is for the "bring" or "attempt to bring" element; we cannot merely read the "plain language" of the statute because Congress omitted any mens rea for the second element entirely. The question is not how to define the phrase "knowingly or in reckless disregard" but rather, in the absence of any mens rea for the second element, should we merely require proof of knowledge or should we require proof that the alleged smuggler acted with an evil mind, i.e., that the Government show proof of general criminal intent?

The mens rea established by Congress for the first element is "knowingly or in reckless disregard." The court, on the other hand, would read in "knowing" to the second element of § 1324(a)(2), but would discard the "or in reckless disregard" language; without question, the court does not merely apply the mens rea Congress chose in an even-handed manner to each element of the statute. To read in one level

97

of <u>mens rea</u>—knowing—yet omitting the second level of <u>mens rea</u>—in reckless disregard— when considering the second element of the offense is hardly adhering to the "plain language" of Congress. In fact, it is fair to say that the court's reading does far more to "functionally eliminate" the "or in reckless disregard" language than does my interpretation. And the legislative history is equally unclear for the reasons mentioned <u>supra</u>.

Instead we are left to conduct a full analysis, using the tools described by Supreme Court precedent, to determine whether Congress made a showing sufficient to overcome the presumption of criminal intent. After considering the text, structure, and penalties authorized for felony offenses under § 1324(a)(2), the answer is clear—Congress did not eliminate criminal intent from the § 1324(a)(2) felony offenses, or at a bare minimum, the issue is sufficiently unclear such that the interpretive presumption cannot be rebutted.

Moreover, for proof that my interpretation would not lead to the results claimed by the court, we need look no further than the numerous decisions of our sister circuits. These decisions are persuasive regardless of whether they interpret § 1324(a)(1) or § 1324(a)(2) because the same structure and language is present in both provisions; to wit, both sections contain the "knowing or in reckless disregard" introduction relating to the status of the alien, followed by some verb that does not

contain any explicit <u>mens rea</u> element specified by the statutory language.[56]  When evaluating any of these provisions, courts are faced with the question of adopting an approach similar to the one taken by the court today, applying the "knowing or in reckless disregard" to each element, or to follow the approach I advocate.

Because the language and structure found in § 1324(a)(1) and § 1324(a)(2) is virtually identical, how our sister circuits answered this question of statutory interpretation is highly persuasive, and yet largely ignored by the court's opinion.  In short, three important lessons are readily apparent after comparing the approach taken by our sister circuits with the approach adopted by the court today: first, the court's approach to the interpretation of § 1324 is the first of its kind—<u>none</u> of the courts cited in the court's opinion or my opinion that have addressed this issue applied the "knowing or in reckless disregard" <u>mens rea</u> to each element; second, a clear majority

---

[56] <u>Compare</u> 8 U.S.C. § 1324(a)(1)(A)(ii) (penalizing any person who "<u>knowing or in reckless disregard of the fact</u> that an alien has come to, entered, or remains in the United States in violation of law, <u>transports, or moves or attempts to transport or move</u> such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law" (emphasis added)), <u>and</u> 8 U.S.C. § 1324(a)(1)(A)(iii) (penalizing any person who "<u>knowing or in reckless disregard of the fact</u> that an alien has come to, entered, or remains in the United States in violation of law, <u>conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection</u>, such alien in any place, including any building or any means of transportation" (emphasis added)), <u>with</u> 8 U.S.C. § 1324(a)(2) (penalizing any person who "<u>knowing or in reckless disregard of the fact</u> that an alien has not received prior official authorization to come to, enter, or reside in the United States, <u>brings to or attempts to bring</u> to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs" (emphasis added)).

of courts have concluded, as I do, that Congress intended that criminal intent remain an essential element, as these courts read in "willfully" to apply to the second element—modifying the verb—in this statute; and third, for over twenty years courts have read this type of statute to include "knowing or in reckless disregard" as the mens rea for the alien's status and "willful" as the mens rea for the defendant's act (bringing, transporting, or harboring) without impacting, much less functionally eliminating, any other language in the statute.

Quite simply, for the reasons discussed supra, neither the text of the statute nor the legislative history indicates that Congress intended to do away with the requirement that a defendant act with an evil mind. That smuggling was a crime at common law, that Congress deliberately chose to use a statutory structure and language that courts have traditionally read to include a criminal intent element, and that Congress prescribed imprisonment for up to fifteen years for a violation are all strong indications that some criminal intent requirement must be read in to the statute. If, by chance, any question remains as to Congress's intent, the rule of lenity requires that we construe the statute to include an evil-mind element.

Accordingly, I respectfully disagree with the court's holding that proof of criminal intent is not required for § 1324(a)(2)(B) offenses. Like our decision in Zayas-Morales and the decisions of our sister circuits, I would hold that in addition

to proving that Dominguez knew or acted in reckless disregard of the fact that the players had not received receive prior official authorization to enter, the Government had to prove that Dominguez acted with general criminal intent. In other words, that he acted "willfully."

## C.

Assuming that criminal intent is an element of the § 1324(a)(2)(B)(ii) offense, the district court erred in prohibiting Dominguez from going forward with his defense that he lacked the criminal intent necessary for conviction. The prohibition was sweeping: the jury was not to hear a word about the CAA, Wet-Foot/Dry-Foot policy, the Meissner Memorandum, whether it would come from Dominguez's testimony or the testimony of the retired Immigration Judge Dominguez attempted to call as an expert witness to explain the operation of the Government's immigration policy as it related to Cuban refugees.[57] True, Dominguez was able to testify on redirect examination that Cubans are entitled to stay in the United States "regardless of how they got to the United States," but only because the prosecutor, on cross-examination, opened the door. Dominguez's statement fell on deaf ears; the court's prohibition prevented Dominguez from testifying at length about how the immigration authorities

---

[57] It requires no citation of authority to say that the district court's order granting the Government's motion in limine was so comprehensive in its scope that Dominguez was relieved of the necessity of proffering the evidence he would have presented in his defense.

handle dry-foot Cubans and from buttressing his testimony with that of the retired

Immigration Judge he proffered.

In instructing the jury at the close of the case, the district court rejected

Dominguez's requested <u>mens rea</u> instructions.[58]  Dominguez's Theory of Defense

Instruction No. 2 read:

> It is the defense in this case that Gustavo "Gus" Dominguez did not
> <u>intentionally</u> engage in illegal alien smuggling or attempt to illegally
> smuggle aliens, and that he did not illegally transport aliens or harbor
> illegal.  At all times, Gus Dominguez was a legitimate Major League
> Baseball player agent who acted lawfully and in the best interests of his
> clients.
>
> I instruct you that if you find Defendant Dominguez in fact did not
> <u>intentionally</u> engage in smuggling, transporting, or harboring illegal
> aliens, you may consider this as evidence of the lack of criminal intent
> by Defendant Dominguez.

(emphasis added).  The court sustained the Government's objection to Instruction No.

2, and gave the following instruction, instead:

> It is Gustavo "Gus" Dominguez's theory of the case that he never entered
> or intended to enter into any conspiracy to bring aliens into the United
> States illegally, to transport illegal aliens within the United States, or to
> harbor illegal aliens in the United States, nor did he <u>knowingly</u> engage
> in illegal alien smuggling or attempt to illegally smuggle aliens, and that
> the did not illegally transport aliens or harbor aliens.

---

[58]  Defendant's Requested Instructions Nos. 1, 2, 3, 17, 30, and 31.

(emphasis added). The instruction was wrong because, for the reasons I state in part III.A., supra, the Government needed to show that Dominguez acted willfully, with the general criminal intent to disobey the law. To find that Dominguez willfully engaged in illegal smuggling, the jury had to be fully informed as to his state of mind. They were not informed because the district court barred the information on which Dominguez acted. That Dominguez honestly believed that he was acting lawfully, in reliance on official pronouncements such as the Meissner Memorandum, and that he intended to present the Cubans to immigration authorities makes this case identical to that in Zayas-Morales; in Dominguez's case as in Zalas-Morales, the defendant's state of mind is critical.[59]

In sum, the district court committed reversible error in failing to instruct the jury that criminal intent was an element of the § 1324(a)(2)(B)(ii) offenses and from

---

[59] Dominguez was justified in reliance on an official Government policy, the Wet-Foot/Dry-Foot policy, and the Meissner Memorandum, which was an official memorandum from the Commissioner of the I.N.S. for his belief that Cuban immigrants have a unique status under federal immigration policy. See United States v. Laub, 385 U.S. 475, 487, 87 S. Ct. 574, 581, 17 L. Ed. 2d 526 (1967) ("Ordinarily, citizens may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach."); see also Raley v. Ohio, 360 U.S. 423, 438, 79 S. Ct. 1257, 1266, 13 L. Ed. 2d 1344 (1959) (stating that individuals should not be punished when the statutes are "inexplicably contradictory" and therefore lead to good-faith mistakes) (citing United States v. Cardiff, 344 U.S. 174, 73 S. Ct. 189, 97 L. Ed. 200 (1952)); United States v. Barker, 546 F.2d 940, 947 (D.C. Cir. 1976) (per curiam) ("[A]lthough the basic policy behind the mistake of law doctrine is that, at their peril, all men should know and obey the law, in certain situations there is an overriding societal interest in having individuals rely on the authoritative pronouncements of officials whose decisions we wish to see respected." (footnote omitted)).

precluding the jury from hearing about the CAA, the Wet-Foot/Dry-Foot policy, the Meissner Memorandum, and, from Dominguez's proffered Immigration Judge, the Government's implementation of that policy. These errors require reversal of the conspiracy, attempt, and smuggling convictions.

IV.

Even if the court somehow concluded general criminal intent is not an element of § 1324(a)(2)(B)(ii), all of the above-discussed evidence was, at a minimum, relevant to the conspiracy charge under Count 1. The indictment prepared by the Government, the Government's requested jury instructions, and the district court's actual instructions to the jury required the jury to find that Dominguez acted "willfully," thereby squarely putting Dominguez's intent at issue. Thus, the district court erred in excluding the CAA, the Meissner Memorandum, the Wet-Foot/Dry-Foot policy, and the testimony from the Immigration Judge.

Dominguez's intent was at issue for the Count 1 conspiracy charge under 18 U.S.C. § 371, for conspiring to violate the transporting, harboring, and smuggling provisions of Title 8. The grand jury, when it indicted Dominguez, alleged that Dominguez "did knowingly and <u>willfully</u> combine, conspire, confederate, and agree with other persons known and unknown to the Grand Jury, to commit offenses against

104

the United States." What's more, the Government requested the following jury instructions for the conspiracy count:

First: That two or more persons in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment; and

Second: That the Defendant, knowing the unlawful purpose of the plan, willfully joined in it;

Third: That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the methods (or "overt acts") described in the indictment; and

Fourth: That such "overt act" was knowingly committed at or about the time alleged in an effort to carry out or accomplish some object of the conspiracy.

For a definition of "willfully" the Government requested the following: "The word 'willfully[,]' as that term is used in the indictment or in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose to either disobey or disregard the law."[60] The district court, when instructing the jury, accepted the Government's requested instructions and gave the instructions to the jury exactly as

---

[60] I note in passing that the Government requested a hybrid between the general intent definition of "willfully" and the specific intent version of "willfully" by essentially giving the pattern jury instruction for general intent, but adding the word "specific." See supra note 39 for a comparison between the two pattern instructions. For the sake of clarity we will refer to the required intent for the conspiracy conviction as specific criminal intent, but whether general or specific criminal intent was the mens rea for the conspiracy count is irrelevant to my conclusion.

written above. The Government has never maintained, before the district court or this court, that the indictment, requested instructions, and actual jury instructions contained any mistakes. We therefore take the "willfully" language and the definition of "willfully" to be what the Government contends is an accurate statement of the law for the conspiracy charge.

Without question, then, criminal intent was an essential element to the conspiracy conviction. For the reasons described in part III.C., the jury had to be informed as to the legal status of the aliens under Cuban-specific immigration policy through reference to the CAA, the Wet-Foot/Dry-Foot policy, the Meissner Memorandum, and the Government's implementation of that policy. Without this evidence, the jury was simply unable to make a finding that Dominguez acted with the criminal intent required for a conviction.

Thus, regardless of whether criminal intent was an element of the substantive offenses, there is no question that criminal intent was an element of the conspiracy charge in Count 1. Exclusion of evidence essential to the jury's determination of whether Dominguez acted with lawful or unlawful intent was reversible error.

V.

Finally, although less compelling, even if the court somehow found that the evidence was properly excluded despite both the grounds explained above, there are

106

additional reasons why Dominguez's conspiracy and smuggling convictions still have to be reversed and a new trial granted. Dominguez's knowledge of the government's policy of treating undocumented Cubans as presumptive refugees entitled to apply for permanent residence status under the CAA was relevant to the question of whether Dominguez knew that the "prior official authorization" phrase of § 1324(a)(2) applied to the players.

Recall that to obtain a conviction under § 1324(a)(2), the Government must prove that the defendant knew[61] that the alien he was bringing to the United States "ha[d] not received prior official authorization to come to, enter, or reside in the United States." As to the attempt to smuggle and smuggling counts, the district court instructed the jury on the elements of § 1324(a)(2)(B)(ii) as follows: Regarding the attempt to smuggle counts, the elements were:

> First: That the defendant knowingly attempted to bring an alien to the United States;
>
> Second: That the defendant knew such person was an alien;
>
> Third: That the offense was done for the purpose of commercial advantage or financial gain.

As for the smuggling counts, the elements were:

---

[61] Or was "in reckless disregard of the fact that the alien has not received prior authorization." 8 U.S.C. § 1324(a)(2). In this case, the Government did not rely on this phrase; rather, it sought to prove that Dominguez knew of the players' unauthorized status.

First: That the defendant knowingly brought an alien to the United States;

Second: That the defendant knew or was in reckless disregard of the fact that the alien had not received prior official authorization to come to or enter the United States; and

Third: That the offense was done for the purpose of commercial advantage or financial gain.

The court obviously erred in the attempt to smuggle instruction by omitting the "prior official authorization" phrase, and thus caused an attentive juror to have difficulty reconciling the attempt to and smuggle instructions. I need not pause to consider whether the omission constitutes reversible error because the district court erred in precluding Dominguez from testifying in full as to his state of mind throughout his involvement with the players. The jury needed to know what Dominguez knew about the application of the "prior official authorization" phrase as it applied specifically to Cuban refugees. Put another way, what did Dominguez know about the law?

A defendant is presumed to know the law. See Dimenski v. I.N.S., 275 F.3d 574, 578 (7th Cir. 2001) ("In immigration law, as in tax law – and criminal law, too, where knowledge of the law is presumed – the Constitution permits the government to leave people to their own research." (citation omitted)); Edwards v. United States, 334 F.2d 360, 366 (5th Cir. 1964) (en banc) ("It is often stated that every person is

'presumed' to know the law.").[62]  What constituted the law that Dominguez should have known?

We start with 8 U.S.C. § 1324(a); he presumably knew its wording, including the "prior official authorization" phrase, which refers to the alien's legal status.  He also knew that, unlike aliens from other countries, the Meissner Memorandum authorized Cuban refugees to enter the United States anywhere, at a location other than a designated port of entry.[63]  And the Wet-Foot/Dry-Foot policy authorized them

---

[62]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[63]  For example, there are two provisions of 8 U.S.C. § 1324(a) that apply to all aliens that are not likely to apply in a case where a Cuban refugee arrives as a place other than a port of entry.  They are §§ 1324(a)(1)(A)(i) and 1324 (a)(2)(B)(iii):

(1)(A) Any person who—

(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs--
. . .

(B) in the case of—
(iii) an offense in which the alien is not upon arrival immediately brought and

109

to enter the United States without valid entry documents, and to remain here—even absent "prior official authorization." Then, after the passage of a specified period of time, the USCIS entertained, in accordance with the CAA and the Meissner Memorandum, the refugees' applications for adjustment of status to that of permanent residency regardless of how they entered the United States.

Finally, Dominguez is presumed to have known of the federal court decisions interpreting § 1324(a). He knew of our Zayas-Morales decision, in which the defendants were acquitted even though they knew that the refugees they brought here were "not lawfully entitled to enter or reside within the United States" and were warned by the U.S. Customs Service and the Coast Guard that, if they brought the refugees here, they would be prosecuted. 685 F.2d at 1274 (noting that the defendants stipulated that "[t]he object of the[ir] trip to and/or from Mariel, Cuba, was to bring back Cuban nationals without visas."). The defendants were acquitted because they lacked the intent to violate the law; they brought the refugees here "so that [they] could seek political asylum or some other status which would permit them to come into the United States and remain." Id.

---

presented to an appropriate immigration officer at a designated port of entry

The baseball players stood in the same shoes as the Zayas-Morales refugees; they were not lawfully entitled to come to the United States. And Dominguez stood in the same shoes as the Zayas-Morales defendants; he brought the players here so they could seek political asylum and remain in the United States—to play baseball.

Zayas-Morales implicitly held that, in light of the trier of fact's finding (albeit a stipulated finding) that the defendants' purpose in bringing the Cuban refugees to the United States was to enable the refugees to obtain political asylum, the words of the statute, "not lawfully entitled to enter or reside within the United States," had no legal effect. The district court was bound to follow Zayas-Morales, including this implicit holding—unless it was able to engage in the analysis this court engages in here. From all I have been able to gather from the trial court record, including the district court's order granting the Government's motion in limine, the district court engaged in no such analysis; rather, it simply ruled irrelevant the immigration policy regarding Cubans. Although the district court was unable to explain why the policy was irrelevant, this court, in affirming the district court's ruling today, attempts to provide an explanation.

This court's explanation, however, does not address the fact that the Government had the burden of proving that Dominguez knew that the players lacked "prior official authorization" to enter—what Dominguez had in his mind while the

111

players were en route to the Florida Keys. Dominguez contends that he was free to say what was in his mind; he was helping the players obtain political asylum and permanent residence here. The district court said: No, the law was clear; what Dominguez had in his mind was irrelevant. Dominguez was mistaken about his view of the law, and "a mistake of law is no defense to criminal prosecution." Order Granting Gov't Mot. In Limine 2, Mar. 14, 2007.[64]

The district court was stating, in effect, that Dominguez knew what this court is saying today; that the "plain language of the statute" made it clear that the effect of the CAA and the Wet-Foot/Dry-Foot policy on the players' immigration status after they arrive[d] in the United States [was] not relevant. Ante at 35.

Implicit in this court's statement about the effect of the CAA and the Wet-Foot/Dry policy on the players' immigration status after their arrival is a holding that the evidence the district court ruled irrelevant—the effect of such policy—was relevant to Dominguez's prosecution for violating 8 U.S.C. § 1324(a)(1)(A)(ii), transporting the players from Florida to California in furtherance of the players'

---

[64] A sound argument can be made that whether Dominguez's knew that the players lacked "prior official authorization," i.e., whether he knew of the players' immigration status, presented a question of fact, not of law. It is elementary that a person's state of mind is a fact. Whether the players had "prior official authorization" is also a question of fact. The Government's proof of such fact came solely from the players, whom the Government called to the stand in its case in chief. They said they lacked "papers" entitling them to come to the United States. The jury heard nothing else regarding official authorization. Under this question of fact theory, the evidence the district court precluded the jury from hearing was admissible.

112

"violation of law," Counts 44 through 48, and 8 U.S.C. § 1324(a)(1)(A)(iii), harboring or shielding the players "from detection," Counts 49 through 53.[65] The district court's error in barring such evidence is of no consequence only because we are reversing Dominguez's convictions on those ten counts on the sufficiency-of-the-evidence ground.

The impact of such evidence is relevant not only to Dominguez's state of mind regarding the players's immigration status after their arrival, but to their arrival as well. As I have shown, the policy provides Cuban refugees with unique authorization to arrive without documents at a location at a place other than a port of entry, an authorization aliens from other countries do not enjoy. I cannot understand how Dominguez could have harbored a mistake of law as to the players' immigration status, i.e., the <u>official authorization</u> status.

The district court, in barring Dominguez from presenting evidence of the federal immigration policy as it pertains to Cuban refugees, instructed the jury as to his state of mind. Therefore, in barring this evidence, the court deprived Dominguez of his Sixth Amendment right to a trial by jury on a critical element of the §

---

[65] As the district court correctly observed in a colloquy with counsel out of the jury's presence, the players, as Cuban refugees, were "entitled to be here under the policy. So be it. And that seems to me to be the end of it." And again, "[o]nce they're here, they're here. They're legally entitled to be here." Having said this, I am at a loss as to why the court did not allow evidence of the players's immigration status to come before the jury regarding Counts 44 through 53.

1324(a)(2)(B)(ii) offense, whether he knew that the players lacked "prior official authorization to come to, enter, or reside in the United States."  The court today agrees that the players had the functional equivalent of "prior official authorization" to enter and reside; what they lacked was "prior official authorization" to come.  This complex and unsettled distinction presents a procedural due process problem, a problem of notice.  Dominguez would need a Philadelphia lawyer[66] to explain how this could possibly be so.

## VI.

Accordingly, I would reverse Dominguez's convictions under the smuggling counts, including the convictions for conspiracy to smuggle, Count 1; attempt to smuggle, Counts 5, 6, 10, 13, and 19; and smuggling, Counts 28, 29, 33, 35, and 40. Otherwise, I concur in the judgment of the court reversing Dominguez's convictions for the transporting counts, Counts 44 through 48; and the harboring counts, Counts 49 through 53.

---

[66]  A "Philadelphia lawyer" is a lawyer knowledgeable in the most minute aspects of the law.  *Merriam-Webster's Collegiate Dictionary* 872 (10th ed. 1993).